UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 26-1334 |
| *Appellee,* | |
| v. | |
| HOWARD RUBIN, | |
| *Defendant-Appellant.* | |

**EMERGENCY MOTION & MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HOWARD RUBIN'S APPEAL FROM AN ORDER OF DETENTION**

Defendant Howard Rubin ("Rubin"), pursuant to 18 U.S.C. § 3145(c) and Rule 9(a) of the Federal Rules of Appellate Procedure, respectfully submits this motion and memorandum of law in support of Rubin's appeal from the order of the Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York, entered on April 29, 2026, detaining Rubin pending trial.

**PRELIMINARY STATEMENT**

1.     The District Court erroneously continued Rubin's detention because it applied the wrong legal standard—acknowledging that "you don't need guarantee[,] [y]ou just need reasonably likely," (Ex. 1, Tr. 44:6-8), yet finding "[t]here is no *guaranteed* security measures that would prevent flight." (*Id*., Tr. 44:1-6) (emphasis added).  The Court stated that Rubin's bail package was "obviously overwhelming," (*Id*., Tr. 43:16), found that under the proposed conditions, it would be "physically

impossible" (*Id.*, Tr. 46:12) for Rubin to engage in the conduct charged in the Indictment or pose a danger to the community, and acknowledged the Government had offered no evidence of flight—only "speculation" that "alone, … wouldn't be enough for [the court] to find that the [G]overnment has met its burden." (*Id.*, Tr. 44:9-15). Yet the Court then inexplicably held that Rubin poses a danger and flight risk based on the Court's personal impressions formed in a prior civil case[1]— labeling him a "*master-of-the-universe*" (*Id.*, Tr. 44:23) who "thinks he can write the rules." (*Id.*, Tr. 44:23-24). The Court concluded:

> "[S]ince I first laid eyes on him back in 2017" and
> "having gotten to know him pretty well, *I don't trust
> Mr. Rubin*."

(*Id.*, Tr. 44:20-24; 45:6-8) (emphasis added). The Court's assessment of Rubin's personality and its lack of "trust" in him are matters outside the scope of the Bail Reform Act and do not address the central issue: Whether the proposed conditions reasonably assure appearance and any conceivable risk of danger.

---

[1] The District Court presided over *Lawson, et al. v. Rubin, et al.*, No. 17-cv-6404 (E.D.N.Y. 2017) ("Civil Case"), which went to trial in 2022. Six plaintiffs asserted claims under the Trafficking Victims Protection Act ("TVPA") and state law. The jury found Rubin liable under the TVPA and one state-law claim, awarding each plaintiff $500,000 in compensatory damages and $120,000 in punitive damages, except one plaintiff who received $500,000 and $250,000, respectively. Rubin appealed and this Court affirmed. *Moore v. Rubin*, No. 24-2018-cv (2d Cir. Nov. 21, 2025). Four Jane Does in this case (#1, 8, 9, and 10) were also plaintiffs in the Civil Case; the Government alleges only Jane Doe #1 is a sex-trafficking victim, and references the other three solely in connection with the Mann Act.

2.      The Court relied on pure speculation, positing a near-impossible escape scenario unsupported by any facts or even by the Government's argument.  In the Court's hypothetical, a wealthy friend—who the Court acknowledged, *"we haven't even heard of"* (Ex. 1, Tr. 47:3-4)—would risk criminal charges by driving to Rubin's home, waiting for Rubin—a 71-year-old man with impaired vision—to evade 24/7 security, run outside, jump into the car, and—while wearing an ankle monitor, and with no access to his own funds or passport—reach an airport and flee the country.  The Court also stated a concern for "hidden assets" (*Id.*, Tr. 46:2), with the basis for denial being "we don't know what we don't know."  (*Id.*, Tr. 43:25). Despite an expansive investigation spanning more than a decade and nearly 12 terabytes of material, the Government offered no evidence that Rubin had any wealthy friends that could or would help Rubin flee or of any hidden assets.  The Court effectively substituted the Bail Reform Act's "reasonable assurance" standard with a guarantee requirement that would eliminate any conceivable possibility of flight:

> "I don't think even if I were to put security guards in the house, that necessarily precludes an escape. A car pulls up, Mr. Rubin goes out, he goes to whatever the airport in Connecticut is, and that's that. Maybe you get the plane stopped in time. Maybe you don't. There is no *guaranteed* security measures that would prevent flight."

(*Id.*, Tr. 44:1–6) (emphasis added).

3

3.      Rubin is 71 years old and suffered a stroke several months before his September 26, 2025 arrest on an Indictment alleging sex trafficking (18 U.S.C. § 1591) and interstate transportation for purposes of prostitution (Mann Act, 18 U.S.C. § 2421).   The charges concern Rubin's private interactions with adult women (referred to in the Indictment as Jane Does) who agreed to engage in BDSM[2] sexual relations but allege that, in certain encounters, he exceeded the scope of their consent.  The Government has acknowledged on the record that *all* of the alleged conduct occurred *more than seven years ago*, and there are no allegations that Rubin ever posed a danger to the community at large.  Rubin has no criminal history, has not traveled outside the United States since 2019, and has deep family ties—particularly to his daughter and grandchildren in Connecticut—without property or ties abroad.  He was keenly aware of the Government's investigation prior to his arrest; had ample opportunity to flee but never did so.

4.      Rubin is neither a danger nor a flight risk; nevertheless, he has proposed an extraordinary bail package, as the Court recognized, that reasonably assures his appearance.  The proposed conditions are:

- A $75 million bond co-signed by Rubin, his wife, Mary Henry, and his daughter, Annalee Rubin;

- The bond will be secured by the following funds and unencumbered properties which combined represent approximately $37.6 million in value:  (i) $10 million in

---

[2] BDSM" refers to bondage, discipline, dominance, submission and sadomasochism.

cash to be deposited with the Clerk of the Court by Ms. Henry; (ii) $25 million in cash to be deposited with the Clerk of the Court by Rubin; (iii) a home Ms. Henry owns in Connecticut with approximately $1.6 million in equity; and (iv) a residence in Connecticut owned by Rubin's brother, Jonathan Rubin, where he and his family reside full time, with approximately $1 million in equity;

- Rubin will transfer ownership in his Crown Global Life Insurance Policies[3] to a United States–based LLC set up specifically for this purpose, and will assign a security interest in the LLC to the Government; Rubin will not have control over the LLC, it will be controlled by an independent trustee; Ms. Henry will transfer ownership of her Crown Global Insurance policy to a U.S.–based LLC, and a separate policy owned by a Mary J. Henry family trust ("Family Trust") will also be transferred to a U.S.–based LLC over which Rubin will have no control and will also be controlled by an independent trustee;

- Rubin will transfer control of each of his accounts to an independent trustee, who will be permitted to take money out of the accounts or to borrow against the insurance policy only for specified purposes, principally family expenses and medical and legal fees;
- Electronically monitored home detention with a 24/7 armed security guard;

- Installation of security cameras to provide 24/7 monitoring of Rubin's residence, with real-time

---

[3] Rubin, Ms. Henry, and the Henry Family Trust hold life insurance policies issued by Crown Global Insurance Group, LLC ("Crown Global"). The policies were purchased circa 2000, and maintained for approximately 26 years; they were not obtained to facilitate flight. Crown Global is based in Bermuda, the policies are administered by a Cayman Islands affiliate, but the underlying investments are held in the United States. (Ex. 2, 2). In prior bail proceedings, the Government questioned whether it could reach assets held in these policies to enforce the bond in the event of flight. Rubin proposed the above arrangement to eliminate any doubt—however unreasonable—that the Government can access the policies. (Ex. 3, 10).

monitoring available for Pretrial Services, as well as video recording;

- Surrender of passport;

- No contact with co-defendants (other than in the presence of counsel) or any known witnesses, Jane Does, or victims; and

- All other standard conditions of pretrial supervision.

(Ex. 3, 4-6).

5.    Despite acknowledging that, under the Bail Reform Act, "you don't need guarantee[,] [y]ou just need reasonably likely" (Ex. 1, Tr. 44:6–8), the Court found this substantial package was insufficient to, indeed, guarantee appearance.

6.    In sidestepping the governing legal standard, the Court's apparent disdain for Rubin was so pronounced that it extended to those supporting his release—going so far as to fault counsel for doing its duty to advocate on his behalf:

> "[T]his is almost incredible to me—*you can even get your wife to forgive you* on some level and put up personal assets to secure your release . . . That is Mr. Rubin, but he thinks it's defensible and *he's very good at convincing lawyers that it's defensible.*"

(Ex. 1, Tr. 45:2-14) (emphasis added).

7.    The record does not establish danger to the community by clear and convincing evidence or flight risk by a preponderance of the evidence; the ruling deprives Rubin of his liberty based on conjecture and unknowns.

6

8.     This Court should rectify the District Court's clear errors under the Bail Reform Act and order Rubin's release under the stringent conditions proposed.

**BASIS FOR EMERGENCY RELIEF**

9.     Rubin seeks expedited treatment under 18 U.S.C. § 3145(c) and Fed. R. App. P. 9(a) and requests an expedited briefing and decision schedule.  *See* 2d Cir. Local R. 27.1(d).  Emergency relief is warranted because Rubin—a 71-year-old stroke victim who requires daily medication—remains detained at the Metropolitan Detention Center ("MDC") pending trial despite proposing an extraordinary bail package that would have secured his release had the District Court applied the proper standard.[4]  Continued detention heightens serious health and safety concerns at the MDC.[5]

10.     Prompt relief is also warranted because detention materially impairs Rubin's ability to prepare for this complex case, which involves voluminous

---

[4] Similarly situated defendants have been released in the Eastern District.  *See, e.g., United States v. Jeffries*, No. 24-CR-423 (NJC), ECF No. 16 (E.D.N.Y. Oct. 25, 2024) (wealthy defendant charged with sex trafficking and interstate prostitution released on bond).  Further, a defendant charged with acting in the U.S. as an illegal agent of the Chinese government, thereby with significant ties to China and risk of flight, was recently released on a $25,000 bond.  *United States v. Wang*, No. 26-CR-186 (WLH), ECF No. 21 (C.D. Cal. May 11, 2026).

[5] Courts have repeatedly described "dreadful" and "longstanding" conditions, including food contamination, hazardous physical conditions, overcrowding, lockdowns, violence, and drug infestations.  *See United States v. Chavez*, No. 22-CR-303 (JMF), ECF No. 31 (S.D.N.Y. Jan. 4, 2024); *United States v. Morgan*, No. 19-CR-209 (RMB), Tr. at 12–15, ECF No. 90 (S.D.N.Y. May 5, 2020); *United States v. Boyd*, No. 21-CR-486 (SHS), ECF No. 74 (S.D.N.Y. Feb. 3, 2022).

discovery, much of it marked "Sensitive" by the Government pursuant to the Protective Order and therefore reviewable only in counsel's presence.

11.     Each day of detention under an order resting on speculation rather than evidence inflicts an irreparable deprivation of liberty.  Rubin respectfully requests expedited briefing and an expedited decision.

## STATEMENT OF FACTS

### A.     Rubin's Background

12.     Rubin is a 71-year-old United States citizen.  He is retired and has three children and four grandchildren.  (Ex. 4, 4).  Rubin lived and worked in New York City for many years before moving to Connecticut in 2021 to be closer to his daughter and grandchildren.  (*Id*.).  The uncontradicted record establishes that, before his arrest, Rubin was living a quiet life in Connecticut, devoted to providing care for his grandchildren, as reflected in multiple letters of support from friends and family.  (Ex. 5, Exs. F-N).  He has not traveled outside of the United States since 2019.  (Ex. 3, 2).  He suffered a stroke within the past year, has high blood pressure requiring medication, and impaired vision.  (*Id*. at 1).  He has no criminal history. (*Id*.)

### B.     Civil Case, Arrest, and Detention

13.     The District Court presided over the Civil Case filed against Rubin in 2017.  *Lawson, et al. v. Rubin, et al.*, No. 17-cv-6404 (E.D.N.Y. 2017).  The

8

plaintiffs asserted Trafficking Victims Protection Act and state-law claims arising from sexual encounters with Rubin. The case went to trial in 2022.

14. As the Court described it in its ruling on post-trial motions, the conduct at issue involved private activity with adult women who voluntarily traveled to New York to engage in BDSM activities with Rubin, and the allegations were that Rubin exceeded the scope of their consent. *Lawson, et al. v. Rubin, et al.*, No. 17-cv-6404 (E.D.N.Y. Nov. 2, 2017), Mar. 20, 2024 Order. For example, the individual referred to in the Indictment as Jane Doe #1 who was a plaintiff in the Civil Case testified that she had a consensual BDSM relationship with Rubin for seven years and acknowledged that, following their last encounter, she sought further encounters with him. (Ex. 6, 4-5).

15. On September 26, 2025, Rubin was arrested on an Indictment alleging sex-trafficking (18 U.S.C. § 1591) from 2015 to 2018, Mann Act transportation (18 U.S.C. § 2421) from 2009 to 2019, and a count of bank fraud (18 U.S.C. § 1344).[6] He was ordered detained and has been held at MDC since his arrest.

---

[6] The bank fraud allegation is based on a financial form Rubin submitted in 2020 in connection with a mortgage he co-signed for co-defendant Jennifer Powers, on which he allegedly stated he was not a party to any lawsuit while the Civil Case (which was publicly filed and had been reported on in the press) was pending. The Government further alleges that Rubin failed to correct that statement when asked to resubmit the same form in 2022.

16. Rubin has presented four bail packages to meet—and exceed—every concern raised by the Magistrate Judges and the Government. (Ex. 3, 7-9). Each time, he refined the proposals to provide the assurances, transparency, and conditions demanded, yet they were rejected because of a failure to apply the Bail Reform Act standards. (*Id*.).

17. Magistrate Judges Peggy Kuo and James R. Cho indicated in the prior bail hearings[7] that they were not concerned Rubin would engage in the alleged conduct if released—recognizing the conduct is indeed dated—focusing instead on financial transparency and flight risk. (Ex. 5, 2-3). Despite providing a complete accounting of his finances, including sworn affidavits of his account, on March 27, 2026, Rubin's bail application was denied by Magistrate Judge Cho. (Ex. 7, Tr. 41:25-42:1).

## C. The District Court's Detention Order

18. On April 16, 2026, Rubin moved under 18 U.S.C. § 3145(b) for revocation of Magistrate Judge Cho's detention order. (Ex. 3). On April 29, 2026, the Court conducted a *de novo* review and denied release, ordering that Rubin remain detained. (Ex. 1, Tr. 47:6-8). The Notice of Appeal was timely filed on May 12, 2026.

---

[7] Held on September 26, 2025; October 20, 2025; December 17, 2025; and March 27, 2026.

19. The Court acknowledged at the outset that "[t]he package is obviously overwhelming on its face," (Ex. 1, 43:16). The Court then identified what it called "two 600 pound gorillas:" (1) whether there exists undisclosed money sufficient "for there to be flight and a life of comfort after flight in one of the many jurisdictions for which there is no extradition," and (2) whether there are unknown friends capable of facilitating flight—concluding: "[W]e don't know what we don't know." (*Id*., Tr. 43:16-25).

20. The Court further acknowledged that, under the proposed conditions, Rubin was incapable of "conducting these same crimes with which he's charged here, the sex offenses," describing it as "physically impossible." (Ex. 1, Tr. 46:9-12). Despite this, the Court concluded that Rubin "presents a danger to the community because he just can't be controlled by any constraints" (*Id*., Tr. 46:23-25)—a conclusion that cannot be reconciled with its own finding that the proposed monitoring regimen would make it physically impossible for Rubin to engage in the charged conduct.

21. The Court also made reference in its ruling to a claim the Government has made about a $1,400 payment Ms. Henry sent via the electronic payment application Zelle shortly after Rubin was detained, which allegedly contained the message: "Did Howard get the floor he wanted." (Ex. 8, 30). The Government's position was that Ms. Henry agreed to pay someone whom she believed had the ability and authority to get Rubin moved within the jail. (*Id*.). However, when asked

11

on the record by Magistrate Judge Kuo, in the December 17 hearing, whether the payment was directed at an MDC employee, the Government acknowledged it had no such evidence. (Ex. 9, Tr. 30:16-23). The conditions at MDC are deplorable; any payment Rubin allegedly requested would have gone to a third party with no actual ability to move him, solely to protect him from harm on his unit—and he has, in fact, remained on the same floor at the MDC since his arrest. The Court nonetheless cited this episode—characterizing it as Rubin's ability to "bribe somebody to get a better bed at the MDC like he talked about with his wife" (Ex. 1, Tr. 45:8-10)—as evidence that Rubin sees "the world from a position of I'm the master." (*Id.*, Tr. 45:6-7).

22. The Government also asserted that Rubin had a history of underreporting wages paid to household employees, including some alleged conduct dating back 10 years. (Ex. 8, 30). The Court referenced these tax-reporting concerns as additional evidence that Rubin "writes his own rules" (Ex. 1, Tr. 46:15) and is a *danger* to the community at large. This issue is simply not a basis to conclude that Rubin is a danger to anyone.

23. The Court acknowledged that "if all we had was unsupported speculation that maybe he's sitting on another $70 million somewhere" or "maybe there's an equally well off investment banker friend who's going to show up with his private plane . . . that speculation wouldn't be enough for me to find that the

government has met its burden." (Ex. 1, Tr. 44:9-15). However, it posited its own far-fetched speculation:

> "I don't think even if I were to put security guards in the house, that necessarily precludes an escape. A car pulls up, Mr. Rubin goes out, he goes to whatever the airport in Connecticut is, and that's that. Maybe you get the plane stopped in time. Maybe you don't. There is no *guaranteed* security measures that would prevent flight."

(*Id.*, Tr. 44:1-6).

24.    Despite an expansive investigation spanning more than a decade and nearly 12 terabytes of material (Ex. 3, 3), the Government offered no evidence—of any "hidden assets that the defendant controls and third parties who can swoop in and save him," but the Court still found both to be "plausible and reasonably likely possibilities." (Ex. 1, Tr. 46:1-6).

25.    The Court reduced the analysis to "a very basic issue of trust." (Ex. 1, 45:24-25), relying on its own impressions of Rubin formed through presiding over the Civil Case, stating: "[S]ince I first laid eyes on him back in 2017" and "having gotten to know him pretty well," it did not trust Rubin. (*Id.*, Tr. 44:20-21). The Court also took aim at those supporting Rubin's release:

> "[T]his is almost incredible to me—*you can even get your wife to forgive you* on some level and put up personal assets to secure your release . . . That is Mr. Rubin, but he thinks it's defensible and *he's very good at convincing lawyers that it's defensible.*"

(Ex. 1, Tr. 45:2-14) (emphasis added).

13

26.     The Court ultimately affirmed Magistrate Judge Cho's detention order, finding by "clear and convincing evidence" that Rubin "presents a danger to the community because he just can't be controlled by any constraints," and finding by a preponderance that "it is more likely than not that he has control of assets either directly or through third parties who we haven't even heard of that could relieve him of the situation that he's in." (Ex. 1, Tr. 47:1-5).

## APPLICABLE LAW

27.     This Court reviews a district court's order of detention for clear error, reversing only where, on the entire record, it is left with the definite and firm conviction that a mistake has been made. *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019).   Whether a bail package will reasonably assure the defendant's presence is a mixed question of law and fact.  *United States v. Horton*, 653 F. App'x 46, 47 (2d Cir. 2016).   This Court reviews the district court's factual findings for clear error.  *Id.*   Where, however, a detention order rests on an error of law— including the application of an incorrect legal standard—this Court's review is *de novo* and the district court's order should be set aside.  *Id.*

### A.     The Bail Reform Act

28.     The Bail Reform Act ("Act") provides that a district court "shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person

14

and the community." 18 U.S.C. § 3142(b). "Reasonably assure" does not mean conditions that will "guarantee" the defendant's presence. *See, e.g.*, *United States v. Madoff*, 586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009) ("The Act does not require that the risk [of flight] be zero, but that conditions imposed 'reasonably assure' appearance."). If a court "determines that trust of the defendant is insufficient to assure appearance and maintain safety," additional conditions should be imposed. *Id*. at 255 (rejecting the "Government's proposition that the setting of bail conditions is 'based, fundamentally, on the trustworthiness of the defendant'"). "Doubts regarding the propriety of release should be resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

29.    A court considering bail must undertake a two-step process: It must determine whether the defendant presents a risk of flight or a danger to the community. If the court determines that the defendant presents either a risk of flight or a danger, it must decide whether there are conditions of release that could reasonably assure the defendant will not flee or endanger others. *See, e.g.*, *United States v. Sabhnani*, 493 F.3d 63, 74-76 (2d Cir. 2007); *United States v. McKenzie*, No. 23-CR-500 (WFK), 2024 WL 2315276, at *2 (E.D.N.Y. May 22, 2024). In determining whether there are acceptable conditions of release, the court must consider the factors set forth in 18 U.S.C. § 3142(g).[8]

---

[8] The factors include the nature and circumstances of the offense charged, the weight of the evidence, the defendant's history and characteristics, and the nature and

30.    The Government bears the burden of showing dangerousness by clear and convincing evidence, *see United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995), and risk of flight by preponderance of the evidence, *see United States v. Jackson*, 823 F.2d 4, 6-7 (2d Cir. 1987).  While there is a presumption of detention for sex trafficking cases (18 U.S.C. § 1591), the presumption is rebuttable.  The presumption imposes on the defendant "a limited burden of production" to rebut that presumption with evidence that he does not pose a danger or a risk of flight," while the "burden of persuasion" remains with the Government.  *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

31.    If a risk of flight is established, the Government must separately demonstrate by a preponderance "that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court."  18 U.S.C. § 3142(b), (c); *Sabhnani*, 493 F.3d at 75; *United States v. Shakur*, 817 F.2d 185, 195 (2d Cir. 1987).  The statute requires only reasonable, not absolute, assurance, and doubts are resolved in favor of release.  *Sabhnani*, 493 F.3d at 75; *Madoff*, 586 F. Supp. 2d at 249.  Speculation, assumption, and hyperbole do not constitute evidence.  *Madoff*, 586 F. Supp. 2d at 247, 249 ("bare assertion" by prosecutor that there "remains some risk of flight" is insufficient; the Government

---

seriousness of the danger to any person in the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

16

must "articulate [the] flaw" in the proposed conditions of release in order to satisfy its burden). When the risk of flight arises "primarily because of [a defendant's] wealth," 24/7 private security is a permissible condition of release specifically designed to mitigate that risk. *Boustani*, 932 F.3d at 82; *Sabhnani*, 493 F.3d at 79. Even when the Government alleges that the defendant is a "wildly wealthy" flight risk, the district court must still consider whether some condition or combination of conditions will reasonably assure his appearance. *See United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989). The Government must "articulate [the] flaw" in the wealthy defendant's proposed bail conditions. *Madoff*, 586 F. Supp. 2d at 249, 255.

## ARGUMENT

**I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW BY FAILING TO APPLY THE BAIL REFORM ACT'S "REASONABLE ASSURANCE" STANDARD**

32.    This error is purely legal and is reviewed *de novo*; it requires reversal regardless of how the District Court's factual findings are reviewed. Rubin proposed an extraordinary, multi-layered package that assures his appearance, and although the Court called the package "overwhelming" (Ex. 1, Tr. 43:16–17), it never explained why the combined secured assets, home detention, monitoring, and trustee/U.S.-based LLC structure would not reasonably assure appearance—because it would—instead reasoning that "[t]here [was] *no guaranteed* security measures that would prevent flight" (*Id*., Tr. 44:1–6) (emphasis added), positing a near-impossible

17

hypothetical escape scenario—lacking any basis. The Act requires "reasonable assurance," not measures that reduce flight risk to zero. *Madoff*, 586 F. Supp. 2d at 249. No set of conditions can eliminate every theoretical possibility of flight. By ignoring the Act's standard and instead requiring guarantees against every conceivable risk, the Court erred as a matter of law and must be reversed.

**II.      THE DISTRICT COURT ERRED AS A MATTER OF LAW, AND CLEARLY ERRED ON THE FACTS IN FINDING THE GOVERNMENT ESTABLISHED DANGEROUSNESS BY CLEAR AND CONVINCING EVIDENCE**

33.      The District Court's dangerousness ruling reflects a legal error reviewed *de novo*: It detained Rubin on a character-based notion of "danger" divorced from the conditions analysis the Bail Reform Act requires. Even if that ruling were treated as a factual finding reviewed for clear error, it could not survive.

34.      The Court's finding that Rubin presents a danger to the community because he can't be controlled cannot be reconciled with its candid (and undoubtedly correct) acknowledgement that the proposed conditions are so stringent that it would be "physically impossible" for Rubin to engage in the charged conduct. (Ex. 1, Tr. 46:11–13).

35.      The Court's alternative theories of "danger"—a $1,400 payment allegedly to somehow secure a move to a different floor at the MDC and alleged underreporting of income to household employees years ago—do not establish danger under the Act. (Ex. 1, Tr. 46:7-18). Stretching "danger" to encompass these

18

claims dilutes the statutory concept beyond recognition and falls far short of clear and convincing proof that no conditions can reasonably assure community safety.

36.     The proposed conditions would make any alleged *dangerous* conduct impossible.  (Ex. 3, 4-6).  The Magistrate Judges agreed.  (*Id*., 10-11).  The danger inquiry under 18 U.S.C. § 3142(g) asks whether conditions of release will reasonably assure the safety of the community—not whether the defendant's character can be "controlled" in the abstract.  Once the Court found the charged conduct physically impossible under the proposed conditions, the statutory danger inquiry was answered, and no residual, character-based notion of "dangerousness" can supply clear and convincing evidence to the contrary.

**III.     THE DISTRICT COURT ERRED AS A MATTER OF LAW, AND CLEARLY ERRED ON THE FACTS, IN FINDING THE GOVERNMENT ESTABLISHED FLIGHT RISK BY A PREPONDERANCE OF THE EVIDENCE**

37.     As with dangerousness, the flight-risk ruling fails first as a matter of law, reviewed *de novo*:  The District Court supplied the missing evidence with speculation and demanded a guarantee against flight rather than reasonable assurance.  And to the extent the ruling is reviewed for clear error, it is clearly erroneous.

38.     The Court acknowledged that "unsupported speculation" about hidden assets and wealthy friends that could help Rubin flee, would be insufficient (Ex. 1, Tr. 44:9-14).  Yet it adopted that very approach, finding it more likely than not—

without a shred of evidence, let alone a preponderance—that Rubin had access to hidden assets or unknown third parties (such as a "banker friend" with a private plane), even though the Government has had his records for years. (*Id.*, Tr. 43:23-24, 45:21–25; 47:2-4).

39.     To the contrary, there is ample evidence, including detailed financial affidavits and financial records listing every asset—that confirm the *absence* of any hidden assets. (Ex. 10; Ex. 11; Ex. 12). Rather than relying on the record, the Court simply stated "we don't know what we don't know" (Ex. 1, Tr. 43:25), and that it did not trust Rubin because he is a "master-of-the-universe." (*Id.*, Tr. 44:20–25; 45:3–14). The Court cannot fill an evidentiary gap with its own speculation or disdain for Rubin.

40.     If the Court found that Rubin could not be trusted, despite showing up every day to the Civil Case and having no prior contact with the criminal justice system, to appear under the conditions proposed, then it was required to impose additional conditions, not reject the entire proposal. *Madoff*, 586 F. Supp. 2d at 255. Yet the Court did not even grapple with the extraordinary proposal, including the highly unusual agreement by Rubin to relinquish control of all of his assets to an independent trustee.

41.     The Court made Rubin's purported access to undisclosed wealth the core driver of flight risk, while disregarding the proposed conditions precisely designed to neutralize any wealth-based ability to flee, including the $75 million

20

bond, $35 million in cash security, the structure that strips Rubin of control over his funds, and 24/7 security. Where the alleged risk is wealth-driven flight, a court must address whether the proposed, enforceable wealth-restricting conditions provide reasonable assurance, which here they do. *See Madoff*, 586 F. Supp. 2d at 249, 255. The Court simply ignored them.

42. The Court's flight risk finding—premised on strained possibilities rather than a preponderance of evidence, and on a demand for a guarantee rather than reasonable assurance—is legal error reviewed *de novo* and, at a minimum, clear error, and must be reversed.

## CONCLUSION

43. The District Court's ruling is contrary to the legal standards set forth in the Bail Reform Act. The District Court's detention order must be reversed.

DATED:  May 28, 2026

By: /s/ Michael J. Gilbert

  Michael J. Gilbert

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Michael J. Gilbert
Katherine Anne Boy Skipsey
mgilbert@sheppard.com
kboyskipsey@sheppard.com
30 Rockefeller Plaza
New York, New York 10112
212.896.0611

AGNIFILO & INTRATER LLP
Marc Agnifilo
Zach Intrater
Teny Geragos
marc@agilawgroup.com
zach@agilawgroup.com
teny@agilawgroup.com
140 Broadway, Ste. 2450
New York, New York 10005
646.205.4352

*Attorneys for Defendant-Appellant
Howard Rubin*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT

1. The undersigned counsel of record for Defendant-Appellant Howard Rubin certifies pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and Local Rule 27.1(a)(1) that the foregoing memorandum of law contains 5,198 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d)(2), according to the Word Count feature of Microsoft Word.

2. This memorandum of law complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this memorandum of law has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font of Times New Roman.

Dated: May 28, 2026

By: /s/ Michael J. Gilbert
Michael J. Gilbert