To Be Argued By:
KAYLA BENSING

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 26-1334

UNITED STATES OF AMERICA,

*Appellee*,

-against-

JENNIFER POWERS, STEPHEN POWERS,

*Defendants*,

HOWARD RUBIN, also known as HOWIE, also known as H,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO THE APPELLANT'S
MOTION FOR RELEASE PENDING TRIAL AND APPENDIX

JOSEPH NOCELLA, JR.,
*United States Attorney,*
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

SUSAN CORKERY,
KAYLA BENSING,
RAFFAELA BELIZAIRE,
NINA GUPTA,
*Assistant United States Attorneys,*
     (*Of Counsel*).

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ii

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS .........................................................................3

    I.    Charged Conduct........................................................................3

        A.    Sex Trafficking and Interstate
              Prostitution Scheme .......................................................3

        B.    Bank Fraud Scheme .......................................................8

        C.    2017 Civil Suit ...............................................................8

    II.    The Proceedings Below .......**Error! Bookmark not defined.**

        A.    The Initial Four Bail Hearings ....................................9

        B.    The District Court Bail Hearing .................................15

ARGUMENT...........................................................................................17

    I.    Applicable Law ........................................................................17

        A.    Standard of Review......................................................17

        B.    Bail Reform Act............................................................18

    II.    Discussion................................................................................19

        A.    The District Court Applied the Correct
              Legal Standard............................................................19

        B.    The District Court Did Not Clearly Err in
              Weighing the § 3142(g) Factors..................................20

CONCLUSION .......................................................................................26

ii

# TABLE OF AUTHORITIES

Page

## CASES

*Easley v. Cromartie,*
532 U.S. 234 (2001) ..............................................................17

*Moore, et al. v. Rubin,*
160 F.4th 271 (2d Cir. 2025) ........................................ passim

*United States v. Abuhamra,*
389 F.3d 309 (2d Cir. 2004) ...............................................17

*United States v. Angwang,*
830 F. App'x 700 (2d Cir. 2020) ....................................21-22

*United States v. Boustani,*
932 F.3d 79 (2d Cir. 2019) ..................................................14

*United States v. LaFontaine,*
210 F.3d 124 (2d Cir. 2000) .........................................21, 23

*United States v. Martir,*
782 F.2d 1141 (2d Cir. 1986) ..............................................17

*United States v. Mercedes,*
254 F.3d 433 (2d Cir. 2001) ................................................19

## STATUTES

18 U.S.C. § 1591..................................................................18

18 U.S.C. § 3142(c)...............................................................21

18 U.S.C. § 3142(e)(1) ..........................................................18

18 U.S.C. § 3142(f) ...............................................................19

18 U.S.C. § 3142(g) ..........................................................18, 21

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 26-1334

UNITED STATES OF AMERICA,

*Appellee*,

-against-

JENNIFER POWERS, STEPHEN POWERS,

*Defendants*,

HOWARD RUBIN, also known as HOWIE, also known as H,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S OPPOSITION TO THE APPELLANT'S
MOTION FOR RELEASE PENDING TRIAL

PRELIMINARY STATEMENT

Defendant-Appellant Howard Rubin appeals from an April 29, 2026 order of the United States District Court for the Eastern District of New York (Cogan, J.) denying his motion for pretrial release. Rubin is charged with two counts of sex trafficking, in violation of

2

18 U.S.C. § 1591, seven counts of interstate transportation for purposes of prostitution, in violation of 18 U.S.C. § 2421, and one count of bank fraud, in violation of 18 U.S.C. § 1344.

Over the course of five detention hearings, each presiding judge continued to order Rubin detained. Rubin now argues that the district court erred in applying the Bail Reform Act's "reasonable assurance" standard and in finding that the government had established dangerousness and risk of flight. As we show below, these arguments are meritless.

3

## STATEMENT OF FACTS

I.      Charged Conduct

    A.      Sex Trafficking and Interstate Prostitution Scheme

Between at least 2009 through 2019, Rubin, his co-defendant Jennifer Powers, and others recruited women to fly to New York to engage in sex involving bondage, discipline, dominance, submission and sadomasochism ("BDSM") with Rubin in exchange for money, often relying on force, fraud, and coercion. (Ex. 8 at 1-2).[1] Before 2011, these sex acts primarily took place at Manhattan hotels. From 2011 to 2017, Rubin leased a Manhattan penthouse apartment (the "Penthouse") and transformed a bedroom into a sex dungeon (the "Dungeon"), complete with soundproofing, locks, and BDSM instruments, where the sex acts primarily took place. (*Id.*).

Rubin received sexual gratification from inflicting pain on women, often in total disregard for their lack of consent. (*Id.* at 3-5). Often, the women were powerless to make the abuse stop—because they

---

[1]      References to "Mot.," "Ex.," "DE" and "Gov. Ex." are to Rubin's motion, the attached exhibits, district court docket entries, and the government's exhibits, respectively.

4

said a safe word or told Rubin to stop, which he disregarded; because they were gagged and unable to coherently speak; or because they lost consciousness. (*Id.*). Rubin subjected his victims to various forms of brutality, including closed-fist beatings of their breasts, heads, and bodies; penetration by foreign objects, like utensils and pool cues; and electrocution. (*Id.*). He left his victims' bodies bruised and at times so deformed that they required corrective surgery. (*Id.*). Then he used coercion to attempt to silence these women, many of whom were vulnerable because of histories of abuse, lack of education, desperate financial need, and addiction. (*Id.*).

For example, Rubin provided Jane Doe #2[2] with a sedative so that he could enact a rape scene, causing her to go in and out of consciousness while he sexually abused her. (*Id.* at 3). As another example, Rubin inserted a pool cue into Jane Doe #1's vagina at the Penthouse. (*Id.* at 4). When she told him to stop, he continued, and he then dragged her to the Dungeon where he gagged, restrained, and

---

[2] References to Jane Does and Co-Conspirators are consistent with those identified in the indictment or the detention memoranda before the lower courts. (DE:21; Ex. 8).

5

further abused her. (*Id.*). Rubin also gagged and tied Jane Doe #4, making it impossible for her to use a safe word, and then brutalized her body, punching her breasts and head repeatedly. (*Id.* at 4-5). Rubin texted Powers after: "It got very rough jenn, we need to be VERY VERY VERY nice…." (*Id.* at 5).

Rubin routinely met with women, sometimes multiple times per week, and used Powers and others in his network to handle logistics, including arranging flights, securing non-disclosure agreements ("NDAs") from victims, who often had not had an opportunity to review them or had been provided with alcohol and/or drugs prior to signing them, and making payments to women. (*Id.* at 2-3). The NDAs grossly misrepresented the sexual activity to which the women would be subjected. (*Id.* at 3-4). Rubin's exploitation of vulnerable victims is highlighted in his assault on Jane Doe #10, who suffered from addiction, which Rubin knew. (*Id.* at 3). When Jane Doe #10 told Rubin she "badly" needed money and was "desperate," he enlisted Co-Conspirator #1 to join him in beating and sexually abusing her because "she's brokke and says [she'll] do anything," and "[s]he hates it, but she's soooo desperate!! We've got to make her cry!!!" (*Id.*).

6

Rubin abused other women in addition to the ten victims named in the operative superseding indictment. (DE:21; Ex. 8 at 4). For instance, in 2011, Rubin solicited commercial sex with Victim 2, during which he told her he "ALWAYS use[d] a safe word and ALWAYS stop[ped]/pause[d] if the girl has reached her limit." (Ex. 8 at 4). However, when Victim 2 arrived at the Penthouse, Rubin instructed her to take pills that caused her to go in and out of consciousness. Instead of respecting a safe word, Rubin hung Victim 2 upside down for more than an hour, repeatedly punched her breasts and body with closed fists, and penetrated and sodomized her, including while she was unconscious. (*Id.*).

To protect the trafficking network, Rubin and Powers attempted to obstruct justice, dissuade victims from turning to law enforcement officials or seeking legal recourse, and influence others' testimony. Their methods included: (a) using NDAs that required women to pay $500,000 to Rubin if they disclosed information about their sexual abuse;[3] (b) after two victims got into a fight at the Penthouse and the

---

[3] In the related civil sex trafficking lawsuit, discussed herein, this Court explained, "the NDAs indicate that Rubin used the penalty

police arrived, paying the legal fees of one of those victims provided she lie to the police about who leased the Penthouse, keep Rubin's name out of the case, and get rid of drugs in the Penthouse; (c) discussing whether they could "bribe" a victim to drop a lawsuit that threatened to expose Rubin's conduct; (d) arranging for the destruction of the Dungeon's BDSM equipment the same day that Rubin's lawyer received a copy of a draft complaint in a civil sex trafficking lawsuit against Rubin (the "Civil Case"); (e) paying a co-conspirator thousands of dollars in the days before her deposition in the Civil Case in which she perjured herself and, the morning of the deposition, messaging her, "Give em hell!"; (f) informing a victim that Rubin had contacted a hitman on the dark web to target women who had filed a civil suit against him; (g) informing a separate victim that he had hired private investigators to investigate women; and (h) sending a letter directly to Jane Doe #5 in which Rubin threatened to

---

clause to intimidate women from speaking out, prevent[] them from taking legal action against him, or make them believe that to receive the agreed-upon payment they had no choice but to subject themselves to conduct beyond that to which they had consented." *Moore, et al. v. Rubin*, 160 F.4th 271, 294 (2d Cir. 2025).

8

"publicly" shame her as "a professional prostitute" when he learned she was seeking to file a lawsuit against him. (Ex. 8 at 5-8; Ex. 7 at 26-27).

B.     Bank Fraud Scheme

Since approximately 2012, Rubin has funded virtually all aspects of Powers and her family's lifestyle, including paying for the down payment and mortgage on Powers's home. (Ex. 8 at 10).[4] To secure the mortgage on that home, which Rubin co-signed, Powers falsely told a bank that Rubin was her "uncle." (*Id.*). Then, Rubin attested in two financial statements, in June 2020 and April 2022, that he was not a party to litigation, when in fact, he was a party to the Civil Case. (*Id.*).

C.     2017 Civil Suit

In November 2017, Rubin and Powers were sued in the Civil Case, over which the district court presided. (Ex. 8 at 11; *Lawson, et al. v. Rubin, et al.*, No. 17-CV-6404 (BMC) (E.D.N.Y. 2017)). Following trial in 2022, the jury found Rubin liable, and this Court affirmed the verdict,

---

[4]     From at least 2014 to the present, neither Rubin nor Powers disclosed any of the money Rubin provided to Powers and her family to the Internal Revenue Service, which they had an obligation to do. (Ex. 8 at 10). Between 2018 and 2023, those payments exceeded $9 million, and they form the basis for tax charges brought against Jennifer Powers and her husband, Steven Powers. (*Id.*; DE:21).

9

holding that "[t]he record is replete with evidence that Rubin developed a sophisticated operation to solicit and recruit various women, inform them that some degree of sadomasochism would take place, provide them a combination of alcohol and drugs like Vicodin and oxycodone, and then grossly exceed the parameters of the activity he told them to expect." *Moore*, 160 F.4th at 292.[5]

## II.   The Proceedings Below

### A.   The Initial Four Bail Hearings

On September 17, 2025, a grand jury returned a ten-count indictment charging Rubin and Powers with sex trafficking, interstate transportation for purposes of prostitution, and bank fraud. (DE:1). On September 26, 2025, following a detention hearing, United States Magistrate Judge Peggy Kuo ordered Rubin detained (the "First Detention Hearing"). (DE:10). On September 30, 2025, a grand jury returned a superseding indictment adding six counts of subscribing to false tax returns as to Jennifer and Stephen Powers. (DE:21). Thereafter, following another detention hearing, United States

---

[5]   Four of the victims named in this case were parties in the Civil Case. (Ex. 1 at 17).

10

Magistrate Judge James R. Cho again ordered Rubin detained (the "Second Detention Hearing"). (DE:44). On December 17, 2025, Judge Kuo denied Rubin's third bail application (the "Third Detention Hearing"), and on March 27, 2026, Judge Cho denied Rubin's fourth bail application (the "Fourth Detention Hearing," and collectively, the "Detention Hearings"). (DE:57, 95).

In connection with the Detention Hearings, the government argued that:

- Rubin's brutalization of women for years demonstrated that he was a danger to the community, as did the extensive nature of his trafficking network, his ongoing financial crimes, and his above-described efforts to engage in obstruction of justice and witness tampering, among other instances of financial and legal coercion. (*See generally* DE:6, 42, 52, 90); *see also Moore*, 160 F.4th at 292 (this Court finding, on related conduct, that the record was "replete with evidence that Rubin developed a sophisticated operation" to traffic women).

- The strength of the government's case against Rubin, which included numerous victims' accounts corroborated by one another and by text messages, emails, photographs, videos, and other records, and the prospect of a prison sentence of at least 15 years and up to life provided a powerful incentive to flee. (DE:6 at 10-11; DE:42 at 5, 10; DE:52 at 18; DE:90 at 10-11).

- Rubin posed a flight risk because at the time of his arrest, he refused to tell law enforcement agents where his passport was; possessed seven cellphones, two of which were newer

11

iPhones inside their boxes and in Ziploc bags, one of which was hidden in a bag with a folding tent; and had secreted stacks of cash in a second bag. At the time, he was unemployed, living alone in a rental home, and undergoing divorce proceedings with his wife, Mary Henry. (DE:6 at 11; DE:42 at 4; DE:52; DE:90 at 11-12).

- Rubin also posed a flight risk because he held most of his assets overseas, principally in three separate life insurance policies held in the Cayman Islands and maintained at Crown Global Insurance Group ("Crown Global"): the "Rubin Policy," maintained by Rubin, with a $38.8 million cash value as of 2025; the "Mary Policy," maintained by Mary, with a $53.8 million cash value as of 2025; and the Mary J. Henry Living Trust policy (the "Trust Policy"), with a $13 million cash value as of 2025. All three policies were used as slush funds for the family. Since 2014, Rubin received approximately $60 million in disbursements from Crown Global. (DE:6 at 11-12; DE:42 at 6, 10-11; DE:52 at 8-11; DE:90 at 9-10).

- Many of Rubin's victims expressed significant fear at the prospect of his release. (DE:90 at 26).

Even throughout the course of the Detention Hearings, Rubin made significant misrepresentations and used one of his suretors to attempt to gain preferential treatment at the Metropolitan Detention Center in Brooklyn, New York ("MDC"). Specifically:

- Rubin lied to Pretrial Services and in the Civil Case about his drug use. (DE:42 at 4-5; DE:52 at 21). The evidence presented in the Civil Case demonstrated that Rubin routinely provided victims with "a combination of alcohol and drugs like Vicodin and oxycodone" and took drugs himself. *Id.*; *Moore,* 160 F.4th at 292.

12

- Between the First and Second Detention Hearings, Rubin claimed that he kept seven cell phones at home because they were either "old devices" kept on advice of counsel and/or because his grandchildren played with them. (DE:52 at 15). But two of these phones were new, in Ziploc bags, and one was hidden in a bag with a folding tent. (*Id.* at 22). And following these misrepresentations, the government learned that Rubin admitted to Mary that he had purchased the new iPhones after "we heard rumors of this, you know, a government thing in like, yeah. December, January." (*Id.* at 22-23).

- Rubin has repeatedly obfuscated his wealth. He informed Pretrial Services that his net worth was $49 million, including the Rubin Policy, which he valued at $35 million, and real estate. (DE:42 at 15). On October 10, 2025, Rubin's counsel falsely represented to the government that the Rubin Policy was the only foreign policy to which Rubin had access, specifically disavowing Rubin's ownership of any foreign policy other than the Rubin Policy and noting that he did not have access to funds in the Mary Policy. (*Id.* at 16). Only after the government confronted Rubin with bank records reflecting disbursements from *three* different Crown Global accounts did Rubin admit that he was a trustee of the Trust Policy and had the ability to take loans against it. (*Id.* at 10-11, 16; DE:90 at 16). The omission was egregious; he received more than $7 million from the Trust Policy into his U.S. bank accounts in recent years, which he failed to disclose to the government and Pretrial Services. (DE:52 at 22). Rubin deposited these loans into U.S. accounts that were used to finance the trafficking network, including to pay for commercial sex, send wires to victims, and pay Powers millions of dollars. (DE:52 at 9). His complete financial picture remains opaque. (DE:52 at 25-26).[6]

---

[6] Rubin, in support of his bail motions, relied on an affidavit from his accountant. (DE:40-15; DE:51-37). Notably, Rubin, Powers, and

13

- While incarcerated at the MDC, Rubin has frequently requested that his proposed suretors, Mary and his daughter, send Zelle and CashApp payments to third parties for preferential treatment. (DE:52 at 23; DE:90 at 12). On September 30, 2025, Rubin asked Mary to send a payment so that he could be assigned to the "quiet floor," and on October 3, 2025, Mary attempted to send a $1,400 Zelle payment with the notation, "Did Howard get the floor he wanted?" (*Id.*).

- Further adding to Mary's unsuitability as a suretor, she has been complicit in his financial misconduct. For example, in February 2023, she circulated a spreadsheet detailing a household employee's fiscal year 2022 salary to her and Rubin's accountant, which reflected a "W-2" salary—as reported to the IRS "on the books"—and a "Full Salary"— which represented what he was in fact being paid. Rubin was copied. The government is aware of another household employee whose income reported to the IRS was tens of thousands lower than that which she received. (DE:90 at 29).

Finally, the government argued that each of Rubin's proposed packages failed to mitigate the serious risks of danger and flight. Specifically:

- The proposed suretors—Mary and Rubin's daughter—have no moral suasion over him. Rubin lived a double life for at least

---

Stephen Powers lied to that accountant, who prepared all of their tax returns, for years. Specifically, the accountant informed law enforcement agents that he had no awareness that Rubin was paying Powers and her family millions of dollars. Thus, even Rubin's accountant had an incomplete picture of Rubin's financial profile. (DE:42 at 15 n.8; DE:52 at 22).

14

a decade, hiding his criminal behavior and flouting family obligations to pursue BDSM sex with victims, concealing, among other things, bank accounts and the Penthouse lease from them, and routinely lying about his whereabouts. (DE:6; DE:42 at 8-9; DE:52 at 23-24; DE:90 at 28-29).

- Even with bail packages increasing in bond amount with each application, Rubin's family, each time, was still left with at least $71 million, much of which would remain overseas— more than enough to facilitate Rubin's flight and support Rubin and his family for the rest of their lives. (DE:42 at 15-16; DE:52 at 24; DE:90 at 29-30).

- Rubin failed to demonstrate the enforceability and efficacy of the proposed terms. As for his proposed trustee agreement, its efficacy depended on the dubious proposition that Rubin would provide a full accounting of his and his family's wealth. The proposal also raised many potential problems, including the enforceability of the trustee agreement and the ambiguity and toothlessness of certain of its terms. (DE:52 at 25-26; DE:90 at 30-32).

- Rubin's arguments about hiring private security are foreclosed by this Court's ruling that the "Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." (DE:52 at 27 (quoting *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019))). Nor would his other proposed conditions prevent flight or mitigate danger—he could, for example, cut an ankle monitor, and a video feed does not prevent him from leaving. (DE:42 at 15-17; DE:52 at 28-30; DE:90 at 32-35).

Judge Kuo and Judge Cho repeatedly found that Rubin had

not overcome the presumption of detention, and that Rubin posed *both* a

15

danger to the community and a risk of flight.  (Gov. Ex. A at 25-28; Gov.

Ex. B at 33; Ex. 9 at 50-51; Ex. 7 at 41-42).[7]

> B.  The District Court Bail Hearing

On April 29, 2026, following another round of briefing and

oral argument, the district court considered Rubin's bail appeal de novo,

stating, in doing so, that it had "read all of the transcripts from the prior

hearings and the parties' arguments."  (Ex. 1 at 2; *see* DE:98, 100-02).  It

then determined

> that there is clear and convincing evidence that
> [Rubin] presents a danger to the community
> because he just can't be controlled by any
> constraints and I think there's a preponderance
> that he is going to flee because I think it is more
> likely than not that he has control of assets either
> directly or through third parties who we haven't
> even heard of that could relieve him of the
> situation that he's in.

(Ex. 1 at 47).  The court made that determination after "look[ing] at

circumstantial evidence and see[ing] if there is a basis for not trusting

the defendant to either make a full disclosure [of his assets] or to let us

---

[7]    Rubin appended transcripts of the initial detention hearings before Judges Kuo and Cho as exhibits to exhibits.  (Ex. 3).  The government thus attaches them here for easier reference as Gov. Ex. A and B.

16

know if there's a friend waiting in the wing[s]" to facilitate flight. (*Id.* at 44).

The court found that Rubin "thinks he can write the rules" with impunity, based on his years of committing violence against women, which Rubin downplayed ("I would call it the BDSM subculture to the 22nd degree removed. There's no culture like this where women end up hurt the way these women were hurt."); his attempted manipulation of others, including to commit crimes ("[I]n terms of him violating the law, whether it's tax reporting, bribing an MDC officer to get him to a different floor…[he] writes his own rules."); the numerous misrepresentations he made during the Detention Hearings ("[T]he way this thing dribbled out, it was like I don't want to say pulling teeth because all it took was the Magistrate Judge denying the bail application, but every time, there was more and there was more and there was more and it wasn't just a little more, it was a lot more"); and the court's assessment of the government's proffer ("The government has really amassed a lot of evidence, no one piece of which is enough to convince me that he's not to be trusted but all of which collectively is so that's why I'm going to affirm the decision of" the magistrate judge). (*Id.* at 43-46).

17

## ARGUMENT

I.    Applicable Law

A.    Standard of Review

This Court reviews a district court's denial of bail for clear error. *United States v. Martir*, 782 F.2d 1141, 1146 (2d Cir. 1986). That standard applies broadly, not just

> to the court's specific predicate factual findings but also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release. We defer to the district court on such matters because of its unique insights into the defendant as an individual and into his personal, professional, and financial circumstances.

*United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004).[8] Reversal is not appropriate simply if this Court "would have decided the case differently." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). The question is whether, on the entire record, the Court "is left with the definite and firm conviction that a mistake has been committed." *Id.*

---

[8]    When quoting cases, unless otherwise noted, citations and internal quotation marks are omitted, and all alterations are adopted.

18

B.     Bail Reform Act

Under the Bail Reform Act, a court must detain a defendant

when "no condition or combination of conditions will reasonably assure

the appearance of the person…and the safety of any other person and the

community."   18 U.S.C. § 3142(e)(1).   In making this determination,

courts must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is…a violation of section 1591…;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character…and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Where, as here, a defendant is charged with a violation of

18 U.S.C. § 1591, a rebuttable presumption of dangerousness and risk of

flight arises, where the court must initially assume there is "no condition

or combination of conditions [that] will reasonably assure the appearance

19

of the person as required and the safety of the community," *id.* § 3142(e)(3), unless the defendant comes "forward with evidence that he does not pose a danger to the community or a risk of flight," *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If so, the government retains the "burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community" and by "a preponderance of the evidence that the defendant presents a risk of flight." *Id.*; *see also* 18 U.S.C. § 3142(f).

II.    Discussion

A.    The District Court Applied the Correct Legal Standard

Cherry picking from the record, Rubin first argues that the district court applied the wrong legal standard because it stated that: (a) "[t]here [are] no guaranteed security measures that would prevent [Rubin's] flight"; and (b) Rubin's bail package was "obviously overwhelming" and made it "physically impossible" for Rubin to continue the offense conduct. (Mot. at 1-2, 17-18).

However, as Rubin himself must acknowledge, immediately after commenting that "[t]here [are] no guaranteed security measures that would prevent flight," the district court cited the applicable

20

standard, stating, "[a]s defense counsel points out, you don't need guarantee. You just need reasonably likely." (Ex. 1 at 44). Similarly, Rubin's citation to the district court's "obviously overwhelming" comment omits important context. The district court indicated in full that "[t]he package is obviously overwhelming *on its face*"—i.e., without consideration for the other Bail Reform Act factors or the significant proffer by the government as to Rubin's dangerousness and flight risk. (*Id.* at 43) (emphasis added). The district court then analyzed those additional factors in detail before finding that "there is clear and convincing evidence that he presents a danger to the community" and "there's a preponderance that he is going to flee." (*Id.* at 43-47).

## B. The District Court Did Not Clearly Err in Weighing the § 3142(g) Factors

Rubin's remaining arguments express disagreement with the district court's careful assessment of the facts (Mot. at 18-21) but fail to identify any clear error in that analysis. Having considered lengthy written submissions, reviewed transcripts of four separate bail hearings at which two different magistrate judges repeatedly denied Rubin's applications, and then heard extensive oral argument concerning the

21

same, the district court made findings, supported by the record, that tracked the analysis required by 18 U.S.C. § 3142(g).

Rubin mistakenly faults the district court's order as premised on a "character-based notion of 'danger' divorced from the conditions analysis the Bail Reform Act requires." (Mot. at 18). But Rubin ignores the plain text of the Bail Reform Act, which specifically instructs district courts to consider "the history and *characteristics*" of a defendant, including his "*character*…[and] past conduct." 18 U.S.C. § 3142(g) (emphasis added).

Relatedly, Rubin argues that "[t]he [c]ourt's…lack of 'trust' in [Rubin] [is a] matter outside the scope of the Bail Reform Act[.]" (Mot. at 2). However, the statute requires a determination of whether a bail package "will reasonably assure" the defendant's appearance and the safety of the community. 18 U.S.C. § 3142(c). Breaches of trust or other deceitful conduct, such as occurred here, are sufficient alone to warrant pretrial detention. *See, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 134-35 (2d Cir. 2000) (non-violent attempts to influence witness testimony constitutes danger to community warranting detention); *United States v. Angwang*, 830 F. App'x 700, 701-02 (2d Cir. 2020)

22

(declining to reverse detention order where district court determined defendant had a "history of dishonesty").

Rubin also claims that the district court's reliance on its familiarity with Rubin from the Civil Case was improper. (Mot. at 2). In fact, doing so comports with the Bail Reform Act's explicit directive to district courts to consider a defendant's history and characteristics. Furthermore, Rubin himself encouraged the district court to consider the Civil Case in making arguments about the strength of the evidence. (*See, e.g.*, Ex. 1 at 8-9). Moreover, the government had proffered significant facts showing that Rubin's attempted manipulation of the Civil Case, including destroying evidence and improper contact with witnesses, warranted detention—facts plainly relevant to the court's analysis.

In other portions of his brief, Rubin egregiously misstates the record. For example, Rubin argues that the district court found it would be "'physically impossible' for Rubin to engage in the conduct charged in the Indictment *or pose a danger to the community*." (Mot. at 1-2) (emphasis added). That is belied by even a cursory review of the record. The district court only stated "it would be physically impossible" under the proposed bail package for Rubin to continue committing "the sex

23

offenses" with which he was charged. (Ex. 1 at 46). It clearly indicated it found Rubin "*present*[*ed*] *a danger to the community*" in "the fact that he writes his own rules in everything," explicitly citing other instances in which Rubin was continuing or attempting to break the law. (*Id.*) (emphasis added).

This Court has never held that a finding of dangerousness is limited to whether a defendant will commit the same crimes for which he is charged. Here, Rubin has a demonstrated history of attempting to control witnesses through financial and legal coercion and other obstructive means, and he has even attempted to manipulate the detention proceedings. Therefore, the district court acted well within its discretion in finding he was a danger, particularly when combined with the staggering violence he inflicted upon many victims. *See, e.g.*, *LaFontaine*, 210 F.3d at 134 (even "a single incident of witness tampering constitute[s] a threat to the integrity of the trial process" and can justify detention on dangerousness grounds).

Finally, the government established that Rubin was a flight risk. Rubin's arguments to the contrary are, once again, riddled with errors. Rubin falsely argues that the district court "acknowledged" that

24

the government "had offered no evidence of flight—only 'speculation.'" (Mot. at 2). Actually, the district court stated that "[*i*]f all we had was unsupported speculation...*if* that was it alone, that speculation wouldn't be enough for me to find that the government has met its burden." (Ex. 1 at 44) (emphasis added). It then outlined how the government *had* met its burden. (*Id.* at 44-47).

Rubin nonetheless disputes the district court's purported "positing a near-impossible escape scenario unsupported by any facts" whereby "a wealthy friend—who[m] the [c]ourt acknowledged, 'we haven't even heard of'—would" facilitate Rubin's escape. (Mot. at 3). But the government need not proffer a detailed escape plan with identified co-conspirators to demonstrate a defendant's risk of flight. It would be the rare case where the government could identify specific "hidden assets" or "unknown third parties" to help him escape. (Mot. at 20). Nonetheless, in this case, the government did identify an entire Cayman Islands-based life insurance policy from which Rubin had borrowed millions of dollars that he entirely failed to disclose to the government, Pretrial Services, or the court, until the government confronted his attorneys about it. (DE:90 at 27). The government identified that one of

25

his suretors (Mary) was attempting to pay off individuals for Rubin to "get the floor he wanted" at the MDC and had been working with him to defraud the IRS (*id.* at 29)—evidencing her willingness to break rules for him. And when arrested, Rubin refused to identify the location of his passport, had large sums of cash stored in his house, and had numerous phones, including one hidden in a bag with a tent. (*Id.* at 28). The district court did not err in finding that he posed a flight risk.

The remainder of Rubin's arguments recycle those he made to the district court (Mot. at 4, 20), which fail to manifest any clear error. Here, where a 70-year-old violent defendant faces a 15-year mandatory minimum on sex trafficking charges; where he has acted with impropriety, including contacting and paying off witnesses in the context of litigation and has even more incentive to do so now faced with the strength of the government's case; where the proposed bail package would leave Rubin and his family with approximately $71 million; where his proposed suretors lack moral suasion over him; and where he has lied under oath and has lied to victims, his family, a financial institution, his accountant, Pretrial Services, the government, and magistrate judges, the district court did not commit clear error in ordering him detained.

26

## CONCLUSION

For the reasons stated above, the district court's detention order should be affirmed.

Dated:     Brooklyn, New York
           June 15, 2026

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.,
                                    *United States Attorney,*
                                    *Eastern District of New York.*

                         By:   /s/ KAYLA BENSING
                               KAYLA BENSING
                               Assistant U.S. Attorney


SUSAN CORKERY,
KAYLA BENSING,
RAFFAELA BELIZAIRE,
NINA GUPTA,
*Assistant United States Attorneys,*
     (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 5,148 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:   Brooklyn, New York
         June 15, 2026

/s/ SUSAN CORKERY
SUSAN CORKERY
Assistant U.S. Attorney

# Exhibits

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X **Docket#**

UNITED STATES OF AMERICA,     : 25-cr-00281-BMC
         :
         :
    - versus -          : U.S. Courthouse
         : Brooklyn, New York
HOWARD RUBIN, JENNIFER POWERS, :
         : September 26, 2025
        Defendants   : 5:14 p.m.

--------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Government**:       **Joseph Nocella, Esq.**
            Interim United States Attorney

          BY:   **Tara B. McGrath, Esq.**
               **Raffaela Belizaire, Esq.**
               Assistant U.S. Attorneys
               271 Cadman Plaza East
               Brooklyn, New York 11201

**For the Defendant**:        **Benjamin E. Rosenberg, Esq.**
               Dechert LLP
               Three Bryant Park
               1095 Avenue of the Americas
               New York, NY 10036

**Transcription Service**:   **Transcriptions Plus II, Inc.**
               61 Beatrice Avenue
               West Islip, New York 11795
               RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

2

Proceedings

THE CLERK:  We have a Criminal Cause for arraignment on an indictment, 25-cr-281, *The United States v. Howard Rubin.*

Counsel, starting with the government, please state your appearances for the record.

MS. MCGRATH:  Good afternoon, your Honor.  Tara McGrath and Raffaela Belizaire for the government.

MR. ROSENBERG:  Good afternoon, your Honor.  Benjamin Rosenberg (inaudible) defendant.

THE COURT:  All right.  Good afternoon, everyone.

THE CLERK:  Can you speak into the microphone, please?  The second microphone.  Pull it closer to the defendant.

MR. ROSENBERG:  I'm sorry?

THE COURT:  The second microphone, can you put it -- yes.

THE COURT:  Good afternoon, Mr. Rubin.  The purpose of the proceeding today is to make sure you understand your rights and what you're charged with, and to determine whether you should be released on bail or held in jail.

You have the right to remain silent.  You don't need to make any statements.  If you've made any statements, you don't need to make any more.  If you

3

Proceedings

start to make a statement, you can stop at any time.  Any statements you do make can be used against you.  Do you understand?

THE DEFENDANT:  I do.

THE COURT:  If you can't afford an attorney, the Court will appoint an attorney to represent you, but I understand that you have retained counsel.

THE DEFENDANT:  Correct.

THE COURT:  Okay.  You've been charged in a grand jury with sex trafficking in two counts.  The first count is with regard to five individuals.  The second count is in regard to one individual.

You also have been charged in seven counts of Mann Act transportation and also with one count of bank fraud.

Did you receive a copy of the indictment?

THE DEFENDANT:  My attorneys have received a copy.

THE COURT:  All right.  And did you have a chance to see it?

THE DEFENDANT:  I discussed it with my attorneys.

THE COURT:  Okay.  And do you understand what you're being charged with?

THE DEFENDANT:  I do.

4

Proceedings

THE COURT:  Do you want me to read the charges out loud or do you waive a public reading of the indictment?

THE DEFENDANT:  I waive a public reading.

THE COURT:  And how do you plead to the charges; guilty or not guilty?

THE DEFENDANT:  I plead not guilty to all charges.

THE COURT:  All right.  Thank you.  I will take this opportunity pursuant to Federal Rule of Criminal Procedure 5(f) to remind the prosecution of its obligation under *Brady v. Maryland* and its progeny to disclose to the defense as soon as reasonably possible all information whether admissible or not that is favorable to the defendant material either to guilt or to punishment and known to the prosecution.

Possible consequences of noncompliance may include dismissal of individual charges or the entire case, exclusion of evidence, and professional discipline or court sanctions on the attorneys responsible for the noncompliance.

I will be entering a written order that more fully describes this obligation and the possible consequences of failing to meet it and I direct the prosecution to review and comply with that order.

Transcriptions Plus II, Inc.

5

Proceedings

Does the prosecution confirm its understandings and obligations and will fulfill them?

MS. MCGRATH:  Yes, your Honor, we understand them and we will comply.

THE COURT:  All right.  Thank you.

I understand that the government is seeking detention in this case, so I'll hear you on that motion.

MS. MCGRATH:  Yes, your Honor.  So there is a presumption of detention in this case given the nature of the charges.  We have filed quite a detailed detention memo outlining the nature of the conduct and the defendant's history and circumstances.  We won't belabor all those points there, but I do want to stress just a few things.

There's a clear risk to victim safety and obstruction.  The nature of the crime demonstrates that. The defendant for years brutalized women even when they asked him to stop and even when they were unconscious.

The aftermath of those crimes is also very telling.  He attempted to obstruct justice and tamper with witnesses.  His co-defendant, Jennifer Powers, told a victim to lie to the police to protect their names which that victim did.  The defendant attempted to bribe another victim to get her to drop charges.  In a 2019 letter he threatened to publically shame Jane Doe number

Transcriptions Plus II, Inc.

6

Proceedings

5 when he learned she was going to be bringing a case against him and to pursue sanctions.  He hired a private investigator to investigate some of the women that he was involved with and he pursued a hitman on the dark web to target women who had filed civil litigation.

This case doesn't just involve the ten Jane Doe that are named.  The defendant will soon learn in discovery that there are dozens of other victims that the government is aware of who are not yet included in charges.

And his network was also more expansive than just the victims.  He relied on at least ten other individuals to recruit women and to facilitate his crime. He poses a danger both to the safety and for obstruction with respect to all of those people.

As the Court is aware, dangerousness as encompassed in the Bail Reform Act also includes prospect of the defendant's continued criminality.

And here, we see that the defendant was undeterred after he was sued civilly.  He was sued civilly in late 2017 and his sex crimes continued.  He trafficked Jane Doe number 6 in 2018, a year later, and he continued to engage in criminal and sexual acts with Jane Doe number 7 during 2019.

His financial crimes continue to this day.  In

7

Proceedings

2020 and 2022 he made brazen lies to a bank to help his co-defendant secure her mortgage. And according to his tax filing from just last month, the defendant has failed to disclose to the IRS millions of dollars he has provided to Jennifer Powers and her family.

The defendant also presents a very significant risk of flight. And there are two points that are included in our memo that we just learned about earlier today that we also want to flag.

The defendant would not tell law enforcement where his passport was, so we do not presently have that. And at his home, he had eight cell phones. Three of them are scattered around the kitchen and two of them were underneath different boxes. There are also three Blackberries. Perhaps those were old, but the five other cell phones were iPhones. This is very unusual conduct for a person and suggests that he's switching cell phones to evade detection.

He's also been dishonest about his financial picture not only given his lies to the bank but also even to pretrial since he reported to Pretrial that he had wealth of $49 million including a life insurance policy of 35 million. But in 2024, he had almost 75 million in one second account in the Cayman Islands so there's no explanation for this $40 million difference. And

8

Proceedings

certainly we do not believe that this unsworn and untested report of his finances is complete either.

We know that the defendant has very significant assets overseas which makes him a considerable flight risk and we do not today have any real transparency as to just what his wealth is.

We also want to stress the strength of the case. The defendant was found liable in the civil case. He testified at a deposition and at trial and he admitted his guilt on the Mann Act transportation counts here. He admitted that he paid women for (indiscernible) sex acts and that many of them traveled from out of state. And indeed, financial records and flight records confirm as much. Each of those counts carries a statutory maximum of ten years.

We submit the defendant's role on the bank fraud charge is also overwhelming. He's embroiled in civil litigation attending depositions and testifying at the trial himself and all the while telling the bank that he wasn't party to litigation.

The evidence on the sex trafficking charges is incredibly powerful. As we've detailed in our memorandum, there are ten Jane Doe victims, six of whom he trafficked. And the evidence corroborating them includes site records, financial records, text messages

Transcriptions Plus II, Inc.

9

Proceedings

in which the defendant is anticipating the harm he's
going to cause them and then recounts to his co-defendant
how violent it had gotten, videos and images of their
bruising, and in some instances their need to seek
medical treatment.

On those counts, the sex trafficking count, the
defendant faces 15 years minimum and his guidelines are
significantly higher.  We estimate his guidelines on the
trafficking counts to be 324 to 405 months.

All of that gives the defendant an extremely
powerful incentive to flee particularly where there's
nothing we see tethering him to this country.  He lives
alone in Connecticut.  He's estranged from his wife.  Our
understanding is she had filed for divorce from him
during the civil case.  He's not been employed for many
years and he has extraordinary wealth overseas.  It would
cost him no hardship at all to pick up and flee to a
country that does not extradite.

For all those reasons, your Honor, and in light
of the presumption in this case, we firmly believe that
there are no conditions or combinations of conditions
that can do the two things that the Bail Reform Act
focuses on and that's ensuring the safety of the
community and ensuring the defendant's appearance in
court as required.

Proceedings

10

THE COURT:  All right.  Thank you.  I'll hear from the defendant.

MR. ROSENBERG:  Can I have one moment, your Honor?

THE COURT:  Yes, please.

(Pause in proceedings)

MR. ROSENBERG:  Thank you, your Honor.  Forgive me, your Honor.

(Pause in proceedings)

MR. ROSENBERG:  Forgive me, your Honor.  May it please the Court.

THE COURT:  Yes, go ahead.  Please move the microphone a little bit closer to you.

MR. ROSENBERG:  Of course, your Honor.

THE COURT:  Thank you.

MR. ROSENBERG:  Your Honor, I would submit that consideration of the evidence that we have to date suggests, and the allegations suggest and demonstrate that Mr. Rubin is neither a flight risk nor a danger to the community such that there couldn't be conditions of bail imposed that would both ensure his return to court, as he's always done, and the safety of the community.

Now, I begin with the flight risk because my colleague and the government said that there's nothing tethering him to this country.  That is -- the record

11

Proceedings

belies that completely.

Mr. Rubin is a 70-year-old man.  He has a wife.
She has filed for divorce.  They continue to be amicable
and to interact with one another throughout the week and
continually.  I'll get in a moment to her support for him
in this instance.

He also has, far from being not tethered to the
country, he has three children, one of whom lives in
Manhattan, one in Texas, and the third in Connecticut
near where he lives.  That is particularly significant.
She lives with her husband and three children.

Mr. Rubin serves -- essentially takes care of
the children on a regular basis five days a week on
average.  He spends time with the children, you know, and
takes care of them, oversees them.

In addition, his daughter is pregnant, so
there'll soon be a fourth grandchild which will only
increase the work that Mr. Rubin does often with his
wife.  Mr. Rubin has -- because they have a joint
interest and care for their children and their
grandchildren especially.

In addition, Mr. Rubin has two grown brothers
who have families.  They live in New Jersey and in
Connecticut as well.  Mr. Rubin has no family abroad.  He
has no ties abroad.  He has no homes out of the country.

Transcriptions Plus II, Inc.

12

Proceedings

And he hasn't left the country in the past approximately eight years according to the pre-sentence report and what we understand.

In addition, Mr. Rubin has been aware of this investigation for almost a year, certainly since late 2024, and he has never remotely made any effort to avoid it, evade it, or to escape.

This testimony, or excuse me, not testimony, this reference to a foreign account, an account, and I'll only note that that is an account of long standing that Mr. Rubin has had.  It was not created to prepare to flee or anything of that nature.  It's been for --

THE DEFENDANT:  25 years.

MR. ROSENBERG:  Up to 25 years.  A long time he's had that.

THE COURT:  How much money is in that account?

THE DEFENDANT:  Approximately 35 million.

THE COURT:  I hesitate to hear your client speak.  Maybe, Mr. Rosenberg, you can speak.

THE DEFENDANT:  Oh, I'm sorry.  Yes.

MR. ROSENBERG:  Forgive me, your Honor.

THE COURT:  No, that's okay.

MR. ROSENBERG:  He beat me to the punch.

THE COURT:  Of course.  And so $35 million in the Cayman Islands?

13

Proceedings

MR. ROSENBERG:  It is an investment -- it's an insurance company that is incorporated in the Cayman Islands and the insurance company is Crown --

THE DEFENDANT:  Global.

MR. ROSENBERG:  -- Global.

THE COURT:  All right.  So this is the $35 million in insurance, life insurance, that existed in their financial records?

MR. ROSENBERG:  That's what we understand, your Honor.

THE COURT:  Okay.  Go ahead.

MR. ROSENBERG:  And as I said, that is of long standing and not moved to prepare for invasion or anything like it.

For those reasons we submit that there are strong ties that tether him to be community.  And as we'll show, you know, we propose a bail package to suffice to guarantee his, to assure his return to court.

Now, in terms of the question as to his danger to the community, of course Mr. Rubin -- forgive me, let me go back for one moment.  Another point to make in connection with his risk of flight, his health condition. As is reported here in the Pretrial Services report in July Mr. Rubin suffered a stroke.  He is currently under the care of doctors and he's taking the medicines listed

Transcriptions Plus II, Inc.

14

Proceedings

there including blood thinners, beta blockers, and he's

under the care of physicians all of which makes him

especially unlikely to leave and to flee.

Now, with respect to the danger to the

community, of course Mr. Rubin, 70 years old, has no

criminal history whatsoever.  The conduct that is alleged

here, the principal conduct, took place in the years

before 2019.  That's the allegedly violent contact.  The

conduct took place before 2019.  Since then, apart from

the allegations about two statements to a bank in 2020

and 2022 I believe, there is no allegation of any

wrongdoing or anything other than a law-abiding citizen.

The government's letter refers to and its

comments here refers to the plaintiffs or victims,

alleged victims who have come forward.  And as the Court

knows and is referred to in some of the government's

materials there was a civil case.  Many of the people in

the civil case were the same ones who we suspect are

referred to in the criminal case.  And in each case those

people came forward, testified fully.  No one was

intimidated or prevented from testifying.  Those are all

people who are known to Mr. Rubin.

And the allegations here are that he mistreated

women who were known to him.  This isn't a case involving

harm to strangers or anything of that nature.  And I

Transcriptions Plus II, Inc.

15

Proceedings

submit that given the evidence, that none of these people was intimated.  All of them were able to testify.  And Mr. Rubin appeared in court every day and faced his accusers, that there's no evidence of any witness intimidation or threats to any, or credible threats, to any witness or victim.

We also note that there is a finding of liability against Mr. Rubin and that is on appeal and has been argued in the Second Circuit and is currently sub judice before it.

Based on those points, your Honor, we would submit that yes, there are conditions that would suffice to assure Mr. Rubin's return and the safety of the community.  Those that we propose that he sign a $25 million personal recognizance bond, that it be secured by his residence in New York.  He has a residence in New York and he rents in Connecticut.  Those are the only two places he is.

The residence in New York is a co-op which he co-owns with his wife who has agreed, as indicated in the Pretrial Services report, to cosign the bond.  And it would be secured by that.  That is worth we estimate as best we can at this time approximately $8 million.

And in addition, that Mr. Rubin, he will of course surrender his passport and that his travel be

16

Proceedings

limited to the Southern and Eastern Districts of New York so he can meet with counsel and appear in court, and also to the District of Connecticut where he spends the vast majority of his time.  All of his time really.

And for those reasons, your Honor, we submit that he should be permitted to have such a bail package and be released on those conditions.

THE COURT:  All right.  Thank you.  The government says that your client has not disclosed where his passport is.

MR. ROSENBERG:  As I understand it, this is news to us, that he didn't -- when he was asked about it this morning he didn't.  I note here that he did tell Pretrial Services and stated that it's located in his apartment in Manhattan.

THE COURT:  Okay.  But he didn't -- was he asked -- again, I don't want your client to answer in open court, but was he asked where it was and declined to say?

MR. ROSENBERG:  I do not know what he was asked and what he said at that time.

THE COURT:  Okay.  And then the residence, you called it a residence, but he doesn't live there in New York, right?

MR. ROSENBERG:  He spends most of his time, the

Transcriptions Plus II, Inc.

17

Proceedings

vast majority, in Connecticut where he's rented a house in order to be near his grandchildren and daughter and her husband.  When necessary, he comes back to his apartment that he owns jointly with his wife.  That is her primary residence.

THE COURT:  Okay.

MR. ROSENBERG:  He spends more time, vastly more, however, in Connecticut.

THE COURT:  I see.  All right.  And I am concerned about his risk of flight and I'm also concerned about the information about his attempts to intimidate the witnesses.

Now, the fact that the witnesses came to court and testified anyway speaks more to their strength and their courage than to any attempts to intimidate them. So, you know, if your client did try to intimidate them but they came nonetheless, the fact that they came nonetheless doesn't overcome your client's attempt to intimidate them.

MR. ROSENBERG:  If I may, your Honor?  I appreciate the point but I don't think that there's any evidence other than some hearsay about that somebody said that he tried to find a hitman which sounds completely -- I mean I have no idea whether there's good evidence of that or not good evidence of that.  Certainly nothing

18

Proceedings

happened of course and there's no evidence, there's no physical evidence that ever happened or what was said.

The other point that the government has made is that he hired investigators. But as your Honor is well aware, in a civil case where there are allegations and accusations it's quite common and quite proper and appropriate to hire investigators to try to learn about any number of things including the accusers. I would submit, your Honor, there's simply no hard evidence of any intimidation.

THE COURT: I thought that the witnesses testified or provided their own information as to attempts to silence them. No? You may not have been the attorney at the civil trial.

MR. ROSENBERG: Your Honor, as I sit here today -- well I was, we were the attorneys in the civil case. I must say I do not recall any such testimony and I don't recall in the government's letter them pointing to any such testimony.

THE COURT: So maybe I could ask the government to clarify that.

MS. MCGRATH: Yes, your Honor. So we, as an initial matter, a number of individuals reported, a number of individuals who we would classify as victims of the defendant's criminal sexual crimes, reported that

19

Proceedings

they thought they had been followed and that their accounts had been hacked.  That is not limited to victims in the civil case.  That also includes victims who are not party to that suit.

Jane Doe number 7 informed the government that the defendant told her that he had endeavored to find a hitman on the dark web, that he succeeded in making contact with that person to target the victims of the civil case but did not ultimately pursue it.

Separately, the defendant filed a threatening letter that he signed that he sent overnight to Jane Doe number 5's parents' house when he learned she was going to pursue litigation against him.

So we submit there's very credible evidence of the defendant's obstructive behavior and attempts to engage in witness tampering and that is a very significant concern here particularly because so many of the victims in our case, both the named Jane Doe's and others that they'll learn about in discovery, have not yet ever been party to litigation against him.

We would also like at an appropriate juncture just to respond to some of the other points counsel raised.

THE COURT:  Okay.

MS. MCGRATH:  I don't know if now's the

Transcriptions Plus II, Inc.

20

Proceedings

appropriate moment or if you had further questions.

THE COURT:  Okay.  Well, I just wanted information about the business of the information with regard to the intimidation.  But I think, Mr. Rosenberg, you hadn't finished what you were saying or I'll give you an opportunity.

MR. ROSENBERG:  Well, I'd like to respond to those points if I may.

THE COURT:  Okay.  Go ahead.

MR. ROSENBERG:  Individuals reporting they thought they'd been followed or their accounts have been hacked.  I'm sorry, without any evidence of accounts being hacked or anything to suggest Mr. Rubin was following somebody or causing the following of somebody I would submit that that is insufficient evidence of any threat to any witness.

Jane Doe number 7 saying that Mr. Rubin said something about hiring a hitman and not doing it, you know, there's no evidence again.  If there was any evidence of that happening or he searched on the web, the government could get that evidence and there's absolutely no suggestion that it has it.

And the letter to which the government refers, if I recall correctly from the government's letter to the Court threatening someone for bringing a case, there is

21

Proceedings

no threat of violence or harm in that case. It was threatening that I believe if she did it, her practice and backgrounds would be exposed to the public.

THE COURT: He did write a letter directly to the witness.

MR. ROSENBERG: He wrote to someone who he anticipated might bring a case against him to say if you do, then your nature and various things will be revealed. That is correct.

THE COURT: Okay. And then there's also information in the government's detention letter that your client offered to -- they used the word payoff, one of the I guess plaintiffs in this case. Can you speak to that? Again, it's an effort to -- it could be seen as an effort to obstruct or intimidate someone.

MR. ROSENBERG: With respect, your Honor, I think that the payoffs to settle cases are absolutely appropriate. I'm aware of such efforts. I'm not aware of any others.

THE COURT: Okay. All right. Great. Ms. McGrath, I think this is an appropriate time for you to continue.

MS. MCGRATH: Thank you, your Honor. And just as to those payouts, they were discussed as between the defendant and his co-defendant as a bribe, so I don't

22

Proceedings

think that that was a settlement effort.

Defense counsel suggests that the defendant has been aware of this investigation for a while.  Certainly there have been no time until today that he knew he was facing the prospect of very, very, very significant time in prison, a minimum of 15 years on each of the sex trafficking counts and a guidelines range up to the, you know, 400 months range.

We are very troubled by his report to Pretrial Services concerning his finances.  He repeated that his insurance account has $35 million.  He reported to the Internal Revenue Service in a foreign bank and financial account report that as of 2024 that amount was 74.4 million.  So there's about 40 million that's unexplained. How that dropped so significantly from that time to today is very suspicious to us and we submit that there's absolutely no transparency as to how much money he has.

The reason that's important of course is because any bond amount has to be tethered to his overall net worth.  For someone who has $30 million, a $25 million bond might be significant.  For someone who has many, many millions more than that, it may not be particularly here where the secured amount is just $8 million.  So if he does have $74.4 million in the Cayman Islands, losing an $8 million property is nothing.  He

Transcriptions Plus II, Inc.

23

Proceedings

has multiples of that in one single foreign account.

We'll also note that he lied to Pretrial Services about his drug use.  We have text messages in which he is talking about recreational drug use including purchasing prescription drugs from one of the victims. He claims he used cocaine once during the incident with Jane Doe number 5.  His apartment was littered with cocaine.  And in fact, that's something that his co-defendant, Jennifer Powers, was very concerned about when the police arrived having the drugs.

In terms of his medical condition, of course he was required to go to the hospital today and that is part of the reason for the delay, and they found that he was fit for confinement.  We can both see him today in open court and certainly he's not suffering from any condition that the MDC and the BOP are not capable of addressing.

Defense counsel suggested that the wrongdoing is historic and that's simply wrong.  As we've written about in our paper and as I submit again today, the defendant continues to lie to the Internal Revenue Service about his wealth and about his payments to Jennifer Powers.  And the most recent filing to the IRS was just last month.  So the criminality here has continued and we also are concerned that any obstructive efforts or witness tampering will of course constitute

24

Proceedings

new crimes and that could very well continue into the future.

And the final thing also is that victims are extremely fearful of the defendant.  Universally, they have revealed as much to us.  So the notion that, you know, that the underlying conduct and the dangerousness has passed is not wrong and it's certainly not wrong as to them.

So unless the Court has any further questions for us at this moment, we'll rest on our oral submission and on our written submission.

THE COURT:  All right.  Thank you.  And Mr. Rosenberg, I'll ask if you have anything else you want to say?

MR. ROSENBERG:  Yes, your Honor.  On the question of how much money is in the Cayman account, my understanding is there's 75, but there are $40 million worth of loans that have been taken out against it, which leaves 35 million of equity.  So that may explain.  I don't know what the representation was that is referred to by the government, but that would explain why the amount of equity is that amount.

There's a reference here to lies to the IRS as recent as the past month.  We haven't seen any of that.  We just have a statement, a government written letter,

Transcriptions Plus II, Inc.

25

Proceedings

but there's no evidence of that.  We haven't seen what was said or any analysis of what needed to be said or not.  So I submit that's not probative here.

And the fact that the victims contend they're fearful of the defendant, the fact of the matter is that any of the sexual activity that's alleged here, there's nothing alleged since 2019.  There's been no harm to any person certainly since that date.  And for that reason I think that he's not a danger to the community.

THE COURT:  All right.  Thank you.  All right. Well, I'll start with the government's representation or argument that this is a presumption case.  So I think we all agree on that.  And I find that the defendant has not overcome the presumption.

This is a very serious set of criminal allegations against Mr. Rubin that spanned several years and all the multiple victims.  The allegations are of very violent behavior and he faces very serious criminal penalties should he be found guilty on one of these, let alone on multiple counts.

So we'll start there.  The evidence as set forth does appear to be strong.  I was struck it's slightly unusual to have a civil case precede a criminal case, but nevertheless, there was a civil trial and so there was testimony elicited under oath at that point.

26

Proceedings

And regardless of the outcome of whatever the Second Circuit may say, there is a factual record of what happened here. And so to that degree, I think the evidence is strong against Mr. Rubin.

Than in terms of the safety of the community, there is indication of threats being made to witnesses. I do not know the degree of the evidence with regard to the hitman. There's an allegation that it came from a specific witness. And then it sounds like there's specific information as to the use of the dark web. So it does not appear to be speculation.

And so for purposes of making a finding at this point, that information combined with the other allegations of approaches to witnesses in a trial, which sound at the very least inappropriate, settlement discussions are usually between counsel and not directly between parties in a situation where physical abuse and threats have happened in the past. So direct contacts of that nature against witnesses and victims also appear to be improper.

So all of these things together, the multiplicity of the threats and attempts to obstruct justice show me that Mr. Rubin continues to be, or poses a threat to the community that cannot be addressed by any bond conditions.

27

Proceedings

And then I will also add that I am very concerned about the risk of flight.  The passport has not been -- was not turned over to the government.  The government has represented that Mr. Rubin was requested to turn over his passport or at least tell them where it was, and I can't imagine that a person wouldn't know where his passport is or where his important papers are located.

The government also represented that there were several cell phones in boxes, three Blackberries.  These were not addressed in defense counsel's representations to the Court.  And so this information also shows state of mind of Mr. Rubin which is that he is planning or trying to evade something.  And certainly all of those cell phones could be used to evade the authorities if he's released even under house arrest.

And the money in the Cayman Islands, whether it's $75 million or $35 million, is a lot of money offshore and so it does show that he has an ability to access money that could enable him to flee and go someplace else and evade the authorities.

As to the point that he has been aware of the investigation for some time, being arrested really focuses a person's mind and makes it real.  So I think that what I'm looking at is what happens from this point

28

Proceedings

forward.  And given the evidence with regard to his ability to flee and his state of mind that would enable to contemplate fleeing cause me to think that, or to conclude that by a preponderance of the evidence that he is a risk of flight.

So all of these things count in favor of detention for Mr. Rubin.

Now, if anything changes and defendant wants to make an application to be released on bond, you're always free to do that, Mr. Rosenberg.  But for today, I find that there are no conditions or set of conditions that will ensure Mr. Rubin's appearance in court or the safety of the community.

As to his health, I'll certainly let the MDC know of his prescriptions.  If you have copies of the prescriptions, please provide those.  We do have a medical form for you to fill out.  I don't know that they'll let him take the prescription drugs directly into the facility, but certainly they should be made aware of his medical condition and what treatment he needs.  And if there are any problems with that regard, please bring that to the attention of the Court.  But this is my decision.

So is there anything else from the government?

MS. MCGRATH:  Your Honor, we have submitted an

29

Proceedings

order of excludable delay seeking to exclude time between now and October 20th which is the date of the first status conference and in the interim we'll seek a protective order and begin with production of discovery.

THE COURT: Okay. And Mr. Rosenberg, have you discussed this with Mr. Rubin?

MR. ROSENBERG: We did. I have not been able to discuss it with Mr. Rubin. We agreed with the government to exclude the time till October 20th.

THE COURT: You have or have not had a chance to discuss this?

MR. ROSENBERG: Not had a chance to discuss it but I believe that I was allowed to do so as his agent to make the agreement to exclude the time. But if may have a moment to speak to confirm that --

THE COURT: Oh, please do.

(Pause in proceedings)

MR. ROSENBERG: Your Honor, I have conferred and confirmed that we can agree to that.

THE COURT: Okay. So just to make the record clear, Mr. Rubin, under the Speedy Trial Act, you're entitled to a trial within 70 days. But your lawyer and counsel for the government are asking the Court not to count the time between now and October 20 so that they can exchange and review the evidence in your case. I

30

Proceedings

understand there's a lot here and so they need extra time

to go through it.  So the time between now and October 20

will not be counted if that is something that you're

amenable to.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So I find given the

voluminous discovery in this case that the ends of

justice served by excluding the time between now and

October 20 and I'll sign this order of excludable delay.

All right.  Anything else?

MS. MCGRATH:  No, your Honor.  Thank you.

THE COURT:  Mr. Rosenberg, anything else for

the defense?

MR. ROSENBERG:  Nothing, your Honor.

THE COURT:  All right.  Thank you very much.

Thank you, Mr. Rubin.

(Matter concluded)

-oOo-

Transcriptions Plus II, Inc.

31

**C   E   R   T   I   F   I   C   A   T   E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **September**, 2025.

*Mary Greco*
Transcriptions Plus II, Inc.

# Exhibit B

Case 1:25-cr-00281-BMC   Document 89-1   Filed 03/24/26   Page 2 of 36 PageID #: 1479

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

-------------------------------X  Docket#
UNITED STATES OF AMERICA,       : 25-cr-00281-BMC
                                :
                                :
    - versus -                  : U.S. Courthouse
                                : Brooklyn, New York
HOWARD RUBIN,                   :
                                : October 20, 2025
             Defendant          : 11:26 a.m.
-------------------------------X
```

        TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
                   AND BAIL HEARING
        BEFORE THE HONORABLE JAMES R. CHO
         UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Government**:        **Joseph Nocella, Esq.**
                               Interim United States Attorney

                          BY:  **Tara B. McGrath, Esq.**
                               Assistant U.S. Attorney
                               271 Cadman Plaza East
                               Brooklyn, New York 11201


**For the Defendant**:         **Michael J. Gilbert, Esq.**
                               Sheppard Mullin Richter &
                                Hampton LLP
                               30 Rockefeller Plaza
                               New York, NY 10112

                               **Benjamin E. Rosenberg, Esq.**
                               Dechert LLP
                               1095 Avenue Of The Americas
                               New York, NY 10036



**Transcription Service**:     **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  This is a Criminal Cause for a Bail Application, *USA v. Howard Rubin*, case number 25-cr-281.

Counsel, your name for the record?  Appearing for the government?

MS. MCGRATH:  Good morning, your Honor.  Tara McGrath for the government and I'm joined at counsel's table by paralegal specialist Marlane Bosler.

THE CLERK:  Thank you.  And appearing for Mr. Rubin?

MR. GILBERT:  Good morning, your Honor.  Michael Gilbert and Benjamin Rosenberg on behalf of Mr. Rubin.

THE COURT:  Thank you very much.

THE COURT:  All right.  Good morning, everyone.  Just to confirm, are you Howard Rubin?

THE DEFENDANT:  I am.

THE COURT:  Hi.  I'm Judge Cho.  How are you doing?

THE DEFENDANT:  I'm okay.

THE COURT:  All right.  I understand we need to do an arraignment on the indictment.  Is that correct?

MS. MCGRATH:  Yes, your Honor.

THE COURT:  All right.  Counsel, I have in front of me a superseding indictment, docket number 21 that was filed on September 30, 2025.

Transcriptions Plus II, Inc.

3

Proceedings

Now, Mr. Rubin, in this superseding indictment you have been charged by a grand jury with these counts. I'll identify them for you.

Count 1, sex trafficking, Jane Doe's 1 through 5.

Count 2, sex trafficking, Jane Doe number 6.

Counts 3 through 8, Mann Act transportation violations.

Count 9, again, Mann Act transportation violations.

And Count 10, bank fraud.

There are forfeiture allegations as well.

Mr. Rubin, have you received a copy of the superseding indictment?

THE DEFENDANT:  I have.

THE COURT:  All right.  And have you had a chance to discuss these charges with your lawyer?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right.  And do you understands the charges against you?

THE DEFENDANT:  Yes, I understand them.

THE COURT:  All right.  Mr. Gilbert, let me ask you does your client want the charges read out loud or does he waive reading?

MR. GILBERT:  We waive the public reading, your

Transcriptions Plus II, Inc.

4

Proceedings

Honor.

THE COURT:  All right, Mr. Rubin, how do you plead to the charges; guilty or not guilty?

THE DEFENDANT:  Not guilty, your Honor.

THE COURT:  All right.  In terms of the indictment, anything else I need to address today, Ms. McGrath?

MS. MCGRATH:  No, your Honor.

THE COURT:  Okay.  All right.  We're here for a hearing on the bail package.  Mr. Gilbert, have reviewed your submission.  I've also reviewed the government's response which was filed yesterday.  Mr. Gilbert, do you want to be heard on your motion?

MR. GILBERT:  Yes.  Thank you, your Honor.

THE COURT:  All right.  Go ahead.

MR. GILBERT:  We request Mr. Rubin's release on the conditions set forth in our letter.  It's a very substantial bail package.  We respectfully submit that it is more than adequate to ensure Mr. Rubin's appearance in court and address what the government claims is a danger to the community.

Mr. Rubin is a 70-year-old man who recently suffered a stroke.  He has no criminal history.  He's been keenly aware he was under federal investigation for years.  Within the last year his counsel was in contact

Transcriptions Plus II, Inc.

5

Proceedings

with the U.S. Attorney's Office about this investigation. He did not flee, he did not buy property in another country, he did not leave, he did not transfer assets. The government has no evidence to suggest otherwise.

The conduct that is the focus of this indictment primarily has been fully and publicly exposed in a civil case that went to trial in this courthouse in 2022. These are lurid, ugly allegations no doubt, but he didn't run away from them then. He faced them head on. He took the stand, he testified in the civil trial. He has no ties to any other country. He has spent his entire life here. He has not traveled outside the United States for over eight years.

And as the Court knows, we have submitted a letter, a very powerful letter from Mary Henry, Mr. Rubin's wife who has filed for divorce yet submitted a letter extolling his commitment to his family and asserting her belief that he will stay here and face these charges.

She's provided -- she's willing to cosign a $50 million bond and post cash and property in support of this application. She's here today.

Even on the government's account of what happened here, Judge, there are no allegations of any of the type of BDSM activities taking place after 2019. For

Transcriptions Plus II, Inc.

6

Proceedings

the last six years, Mr. Rubin has been devoting his time and attention to his grandchildren. And we have submitted letters of support that attest to this. That is what he has been doing.

Let me summarize briefly the bail proposal and I would like to address some of the specific points the government has raised about risk of flight and danger to the community.

As I said, it's a substantial package. It's in our letter. It's $50 million personal recognizance bond. It will be signed by Mr. Rubin, by Ms. Henry, and by his daughter. It's got $6 million in cash, a home that Ms. Henry owns in Connecticut with approximately $1.6 million in equity, and a home his brother Jonathan owns in Connecticut with approximately $1 million. That is his primary and only residence. It's got 8.5 million in value approximately to secure the bond.

His assets, and we talk about this in the letter and as the Court knows from the prior proceeding that you have the transcript of, the government has an issue about a life insurance policy that Mr. Rubin owns. As part of this bail package, he will relinquish his right to access funds from that policy that holds almost the entirety of his net worth.

The independent trustee would be appointed and

Transcriptions Plus II, Inc.

7

Proceedings

that person will be empowered to only allow funds to be used for living expenses, medical, and legal bills.  That should address, and we respectfully submit that it does address, the government's assertion that simply because someone has access to funds they're going to flee.

He will not be able to access that cash to leave the country.  He'll be under home detention, 24/7 security cameras.  He will surrender his passport.  And these conditions are more than sufficient to ensure he will appear, your Honor.

His ties, as I said -- let me address some of the risk of flight factors.  Again, his ties are profound to this country.  And despite the government's assertions to the contrary, it's undeniable.  His daughter Anna Lee, who lives in Connecticut -- and as I said for the last seven years, this is what Mr. Rubin has been doing.  He's lived hear her and devotes his time to helping care for her three children.  She's got a forth child that she's due in just a few weeks.  There's been periods where he would act as a primary caregiver for those children.  And again, we've provided letters from his daughter, from people in the community who attest to this.

One of the letters is from his daughter, Anna Lee.  And as I said, she attests to his schedule.  This is Exhibit C to our submission.  This is his weekly role.

Transcriptions Plus II, Inc.

8

Proceedings

He picks up the children from school four afternoons a week, he takes them to after school activities including tap dance, ballet, gymnastics, and swimming.  It's all laid out in her letter.

I'd also refer the Court to the letter I mentioned from Ms. Henry who concludes by saying he would never abandon his family.  He has always placed them at the center of his life and they remain his greatest source of strength.  I believe in his commitment to his family.  I'm not concerned he would flee from his obligations under bail.

And now as I said, he did suffer a stroke.  He suffered a stroke in July.  He is receiving treatment and medication for that.  I think that factor also should lead the Court to conclude that it's unlikely, in addition to all the other reasons, that he would flee.

The government has raised issues about his passport.  His passport is here.  He will surrender his passport.  Frankly, it confirms what we've said about his lack of ties to any other country.  He hasn't traveled outside the United States in eight years.  There were some -- the government asserts that he misled the agents when they came to arrest him about the location of his passport.  We dispute that.  But the fact is it's been -- we have it.  He's prepared to turn it over as far as this

9

Proceedings

bail package, and it shows he doesn't have ties outside of the United States.

The government also made arguments about the fact that there were electronic devices that were seized from his home.  We don't see how that is in any way evidence of him fleeing or intending to flee.  We addressed it thoroughly in our submission.  But I think it's fair to say that nobody keeps three old Blackberries and an iPod to facilitate fleeing the country ahead of the FBI.  It wouldn't help.

He did keep old devices, as we say in the letter, because there was civil litigation and frankly, he was advised, and he followed the instructions, that he should not destroy devices that might contain relevant communications, and he didn't do so.

The government's submission also relies on cases in which defendants are charged with sex trafficking but those cases are very different and they insist that they reflect that the routine, orders of detention are routine in such cases but they're very different.  Those are cases that involve people in some cases they were not U.S. citizens, they had very significant ties with other countries, or they were drug addicts.  None of those factors apply to Mr. Rubin.

Now, let me address some of the points about

10

Proceedings

danger to the community.  And the primary argument we have on that is one I've already mentioned that this conduct is old.  We don't have the evidence yet, but the government on its own assertions, they're not alleging that there's any BDSM activity after 2019, so it's been years, years.  And he is been under investigation, we don't know exactly for how long, but it seems for years and the government hasn't moved to do anything up until now.  So it's difficult to understand how they view him to be a danger to the community.  They would have acted sooner if that was the case.

In general, the type of conduct that's alleged here doesn't give rise to concerns about the community at large.  It is private sexual activity involving adults.  It is BDSM.  There's no question about that.  But the record I believe from the civil trial speaks for itself and I think the gist of it, your Honor, was that it involved allegations from adults who voluntarily traveled to New York City from out of state and agreed to engage in sadomasochism with Rubin.  They alleged that he went too far.  But that was the heart of that case.  And what I'm reading from is Judge Cogan's opinion on the post trial motion at page 2.  That's the summary of those types of allegations.

So it wasn't that -- these people were known to

11
Proceedings

him.  The evidence at trial, there was extensive text messaging that demonstrated that Mr. Rubin was up front and described that this was going to be BDSM.  There was extensive text messaging admitted at the trial that showed that even after these encounters the women were complementary toward Mr. Rubin.  All but one returned for additional encounters.  So that is just the type of activity that the civil trial involved.

And I will say one notable aspect of the government's indictment is that there are four Jane Doe's in this indictment who are also plaintiffs in the civil case but only one of those Jane Doe's does the government allege to be a victim of trafficking.  The others they include only in the Mann Act.  That to me suggests that they have reviewed the civil case and they understood that there was a reason why they shouldn't name them as victims of sex trafficking.

Now, let me address -- there's an allegation about a hitman.  When we heard that, frankly, in the government's presentation at the initial presentment it was shocking to us to hear.  And so we went to the government immediately after that healing and we asked them to see all the evidence that relates to that and to their credit, even though they didn't have to give us discovery, they did.  And they gave us two 302s, two

Transcriptions Plus II, Inc.

12

Proceedings

witness statements, both of them from this year.  We don't know who the person is because it's a Jane Doe and they haven't disclosed any of the identities.  And what it says is that there's a statement in 2024 that at some point, perhaps years earlier, Mr. Rubin "once implied that he asked Powers about a hitman."  So it's extremely thin.  They have apparently no corroboration to suggest that any steps were taken.  There's reference to going on the dark web but they haven't produced any internet searches or any electronic evidence to suggest that any of that ever happened.  There's no contemporaneous emails, text messages, anything of that sort.

So we respectfully request that the Court not credit an allegation like that without giving us the opportunity to question the witness who is making such an assertion.

The government doesn't claim a hitman was ever hired or engaged to hurt anybody.  So really it's unsubstantiated, an anonymous statement made years after the fact about something that never happened.  It deserves no weight.

So for the reasons set forth in our letter and as I've just described, your Honor, we believe that our bail package is more than sufficient to assure the appearance of Mr. Rubin and we respectfully request the

13

Proceedings

Court enter an order to that effect.

THE COURT: Ms. McGrath, do you want to be heard?

MS. MCGRATH: Yes, your Honor. As an initial matter, there was an extensive hearing before Judge Kuo during which she considered many of these same arguments and rejected them and the Court today should do the same.

Starting with a hitman, the government did furnish two witness statements from an individual known to the government and known to the grand jury who was identified as Jane Doe number 7. This is not an anonymous source but someone who's made herself available to law enforcement. And she told law enforcement he once made comments to her about hiring a hitman to target the women who had filed the civil suit. He had looked on the dark web and made contact with a hitman but said that it was too much money which seemed very real to Jane Doe 7. She did not think Rubin was lying. He was getting off on talking about this. He said these women were stupid whores he met on Instagram. That victim also indicated that she was willing to testify to anything she told the agents.

Respectfully, as Judge Kuo found, that is a specific statement from a specific individual with considerable detail and it should be credited.

Transcriptions Plus II, Inc.

14

Proceedings

Defense counsel's suggestion that there should be some record of the defendant going on the dark web, (indiscernible) of what the dark web is. The reason criminals use it is because it is hard to detect and trace their activity.

Moreover, whether or not Howard Rubin went on the dark web as he claimed to Jane Doe 7 misses the point. By telling Jane Doe 7 that he was trying to find someone to harm and kill people who had pursued litigation against him, he was sending a very clear message to Jane Doe number 7 and that message was received.

Going to the beginning of counsel's statements, they repeatedly suggest that this bond package is very substantial but the Court has no ability to discern that. We have no transparency as to the defendant's actual financial situation or that of his family. We know that he has very significant assets overseas and we know little about his domestic assets.

As the government outlines in its letter in response, it's unclear that we could recover $50 million if the defendant were to flee because it seems this family parks most of their money in the Cayman Islands.

The defendant has also been dishonest about his financial picture. Counsel represented to the government

Transcriptions Plus II, Inc.

15

Proceedings

that the only foreign policy to which he had access was his own life insurance policy.  The government then went back to counsel and said we actually see the defendant receiving money from the Cayman Islands from three different account numbers.  It was only then that they disclosed oh yes, actually he's a trustee on another policy.  And separately from IRS filings we know that policy is valued at approximately $20 million.

Defense counsel proposes that the defendant could just resign as trustee but his two brothers are still trustees of that account.  So even with all their proposals, the defendant and his family will be left with tens of millions of dollars in the Cayman Islands that they can use to support his flight.

He also claimed that he was keenly aware of this conduct for years and years and years and never did anything.  We submit that that's not true.  He may have suspected that there was an investigation but it wasn't until he was arrested that he knew what the charges were and the penalties he was going to face.  At that time, he already had considerable funds in the Cayman Islands.  He refused to provide his passport to law enforcement.  And on this point we want to be very clear.  When he was arrested and when law enforcement said where's your passport, he refused to tell them.  He did not say I do

16

Proceedings

not know, I cannot recall, I do not remember.  He refused.  He was with law enforcement for hours.  At no time during that period did he say he didn't remember where it was.  That we submit evidences his intent to flee.

He also had a number of new cell phones.  Counsel claims he had this habit of having old cell phones lying around and so that's just because he was involved in the civil case.  He had two new iPhone 16 Pros in boxes, one of which was hidden in a tent box.  Again, that evidences his intent to flee.

Defense counsel is also trying to draw parallels between the criminal case and the civil case.  To be clear, there are a number of different victims in this case.  We submit very little could be concluded about our charging decisions as to the trafficking victims because if the defendant is convicted on any of the trafficking counts, if he's convicted with respect to just one Jane Doe, his statutory minimum penalty is 15 years and his guidelines are in the hundreds of months.  If he is convicted on just one victim, he will very likely spend the rest of his life in jail.

Under those circumstances, we submit the Court should not draw any conclusions about the strength or lack of strength of evidence with respect to any other

17

Proceedings

victims because here we're talking about such significant sentences with just one victim and we've charged very many.

In terms of the strength of the evidence, defense counsel also ignores in its oral submission and in its written submission the fact that because there was a civil case the defendant has already conceded to much of the conduct that comprises the Mann Act transportation counts.  Each of those counts carries a maximum penalty of ten years imprisonment.  And we submit there's no defense to any of them.

Defense counsel spends much time in its papers talking about the defendant's strong family ties.  But as we show in our opposition, the record in no respect supports his claim that he is a devoted family man who is committed to his family.  What it instead shows is that during the relevant period the defendant flouted his obligations to his family, lied to them, and engaged in conduct that would necessarily cause them considerable harm whether or not he was ever charged criminally.

History shows us that harm to his family was not a deterring effect then and it certainly won't be now.  He's given this Court no reason to believe the circumstances have changed.  And in fact, now that he is faced with the prospect, the very real prospect of

18

Proceedings

spending the rest of his life in jail, he's more incentivized than ever to flee and evade this prosecution.

As to the defendant's medical condition, nothing in the record supports any suggestion that it's an impediment to flight. He appears to be very active with his grandchildren. He's taking two medications. He's seen doctors. Again, they've provided nothing to suggest that those conditions couldn't adequately be handled by a doctor in another country or frankly by the MDC as they have been until now.

Finally, I want to discuss generally just efforts of witness tampering. The government profit five different examples of the defendant and his co-defendant, Jennifer Powers, tampering with witnesses. We supported those examples with reference to specific Jane Doe's from who the information came, with text messages, and with a letter that the defendant sent. In two examples, those communications were in the context of ongoing litigation. The defendant had no qualms about reaching out to those victims directly notwithstanding that they were embroiled in litigation and clearly had representation.

Shockingly, as to the letters he sent to Jane Doe number 5 on the precipice of her own case, apparently his lawyers blessed that communication. That

Transcriptions Plus II, Inc.

19

Proceedings

communication is clearly threatening.  That it does not threaten violence has no bearing on finding that this was in fact an attempted witness tampering.  And the government cited to a Second Circuit case on that point in its opposition.

Given the defendant's history of witness tampering and the fat that he is more incentivized than ever to try to tamper with witnesses now, the Court should find that he does present an ongoing danger.  And as Judge Kuo found, no bond condition can reasonably assure the safety of the community in those circumstances.

THE COURT:  All right.  Anything else, Ms. McGrath?

MS. MCGRATH:  Unless the Court has any questions, no, your Honor.

THE COURT:  All right.  Mr. Gilbert, anything else?

MR. GILBERT:  Very briefly.  I'd like to respond to a few of the points.

On the witness tampering, I will say that the civil case proceeded, it was filed in 2017, it went to trial in 2022 and in all that time we're not aware of any claim being made that Mr. Rubin did anything to tamper with those individuals.  They came to court, they

Transcriptions Plus II, Inc.

20

Proceedings

testified in the trial.  I'm certain that Judge Cogan would have been made aware if there was any such claims. There were none.

With regard to the Mann Act, I will say that our preliminary analysis of the guidelines suggests that even if the government were to achieve convictions on all of them, it's in the range of 41 months, 41 to 51 months guideline range.  Don't hold me to that.  You know, there's enhancements and I'm sure the government may have a different view.  But we're just not talking about a situation where that would give him, you know, a sufficient -- that he wouldn't be looking at any mandatory minimums and he could possibly get even lower than that if it came to that, Judge.

And with regard to the funds, I just want to make clear we submitted an affidavit from his financial advisor that he doesn't have accounts, brokerage accounts, in the Cayman Islands.  What he has is an insurance policy.  The insurance company is in the Cayman Islands.  But the funds, and it's set forth in the affidavit from the financial advisor, within that policy are invested in stocks, bonds, and other instruments. And the investing is done in a brokerage account that is in the United States.  So the government can, if they were in a position where they had to enforce the bond,

Transcriptions Plus II, Inc.

21

Proceedings

access those funds.

And so for those reasons, Judge, we submit that our package is more than sufficient to assure his appearance.

THE COURT:  Let me ask you a few questions.  So the government has questions about your client's financial transparency.  In their papers they said a few times that they're not quite clear what funds he has either domestically or internationally.  How would you address that concern?

MR. GILBERT:  Well, it's our understanding, and we have again the affidavit from his financial advisor to support this, that his primary wealth is in this one insurance policy that is in his name.  He does have other accounts.  I don't know the exact amounts.  But in any event, to address that concern, our proposal would be that this individual at takes ownership of the insurance policy would be, would also have ownership of any other accounts that he has.  I believe he did disclose some other accounts in his Pretrial Services submission.  And we're prepared to submit a detailed financial statement and we would lay out exactly what accounts would be taken over by this trustee so that he doesn't have access to those accounts.  I think that should more than suffice.

This is not a financial fraud case.  And in a

Transcriptions Plus II, Inc.

22

Proceedings

lot of these, you look at some of the bail packages and, you know, in Madoff and those types of cases, this is not a situation where he's accused of taking investor funds. You know, it's his money.  And we're trying to address the government's concern that just because someone has access to a lot of money they could potentially leave. Frankly, we've gone overboard in that respect because he's willing to basically turn over his assets to a trustee to address that concern.

THE COURT:  It seems to me that another concern that the government has is witness intimidation.  All right?  And I'm mindful that there are no allegations post 2019 in the indictment against the defendant.  So in a sense some of the allegations are a bit dated.  But they are concerned about witness intimidation.  What do you think your package does to assure this Court that there won't be any witness intimidation going forward?

MR. GILBERT:  Well, one of the provisions would be that he have no contact with any of the Jane Doe's, his co-defendants, or any potential witness.  That would be an order and we would certainly consent to that.

You know, what the government asserts is witness tampering frankly we disagree.  We don't think it's witness tampering for somebody to send a letter to somebody saying that if you proceed to sue me, the

Transcriptions Plus II, Inc.

23

Proceedings

following facts will be revealed in a public forum.

That's true. And the government thinks that it's

overbearing. I think an argument can be made if it came

from counsel it would have been received as not

overbearing. But it's not, in our view, witness

tampering in any respect.

And you know, I think we've addressed the --

oh, and the other assertion is that hiring private

investigators is witness tampering or somehow instructive

conduct and we just, we don't agree with that. And its

common practice. There was civil litigation. Through

counsel, private investigators were retained and frankly,

that's normal. I don't think there's anything

inappropriate about it.

And again, we've had the experience of all

these years of litigation including in front of this

Court. There hadn't been any credible allegations of him

doing anything to prevent anybody from coming forward if

that's what they choose to do.

THE COURT: All right. Ms. McGrath, let me ask

you a question. This alleged hitman comment, when was

that made? When was the statement made to the witness?

MS. MCGRATH: Your Honor, that witness last saw

the defendant in approximately 2019 and she reported it

to the FBI in 2024.

Transcriptions Plus II, Inc.

24

Proceedings

THE COURT:  As far as you're aware though, were there any witnesses that were going to -- well, maybe defense counsel knows better, were there any witnesses that were going to testify in the civil proceeding that did not testify for whatever reason and that the government argued there was some sort of intimidation as to those witnesses?

MS. MCGRATH:  Your Honor, that is not something to which we would have been privy, but respectfully, as Judge Kuo found, the defendant's efforts are what's important, his attempt to intimidate them.  Whether he was successful or not is not really the point.  And the fact that people did in fact testify and were brave enough to do so, reflects their courage and strength as opposed to his intent to tamper with the trial.

THE COURT:  But in terms of the allegations of witness tampering, is there anything post 2019 from your perspective?

MS. MCGRATH:  No, your Honor.  But I will note this case involves many different victims in the civil case, some of whom have never been party to litigation with the defendant.  And the defendant will also receive in discovery significant volumes of material that reflect a number of other individuals with whom he had commercial BDSM sex and engaged in extremely violent and in some

Transcriptions Plus II, Inc.

25

Proceedings

instances not consensual conduct.  It's not clear to us that he knows that the government is in communication with them.  So the scope of what we're discussing is not a number of civil plaintiffs who've already litigated this matter, but not only the ten Jane Doe's charged in our indictment and all the other individuals who have come forward to the FBI.

THE COURT:  Are you aware of any allegations of intimidation after 2019 though?

MS. MCGRATH:  No, your Honor.

THE COURT:  All right.  And then are you aware of any other allegations regarding sex trafficking post 2022?  Is that correct?

MS. MCGRATH:  Your Honor, the defendant -- the last sex crime was charged in 2019.  The defendant is charged with bank fraud in 2020 and 2022.  And as we note in our submission, the defendant's failure to be (indiscernible) in his financial disclosures continue through this day through his tax filings and submissions to the IRS.

THE COURT:  Understood.  So you've indicated in your papers that you're concerned about the defendant being fully transparent with his financial records.  What more do you need from the defendant for you to be assured that he has provided to you all of his financial

Transcriptions Plus II, Inc.

26

Proceedings

information?

MS. MCGRATH:  He's provided none, your Honor. He was interviewed by Pretrial Services and indicated his assets in an unsworn statement, and he filed an affidavit from his accountant which speaks only to the Crown Global policy.  It does not represent that he holds no other foreign assets.  And as we know, the defendant has been lying to that accountant.  The government interviewed that individual and he did not know that for years the defendant had been sending millions of dollars, in excess of $9 million, to Jennifer Powers and her husband.

So we submit even that accountant does not have a full financial picture from the defendant.

THE COURT:  All right.  Mr. Gilbert, do you want to address any of those points?

MR. GILBERT:  Well, as I said, your Honor, we would submit a financial statement that sets forth all of his accounts.  And we're prepared to do that.  And as I said, we're prepared to ensure that he doesn't have the ability to access the cash.  That will be -- the ownership of those accounts will be transferred to a trustee.

THE COURT:  Anything else, Ms. McGrath?

MS. MCGRATH:  Your Honor, that presumes though that the defendant is in the first instance forthcoming

Transcriptions Plus II, Inc.

27

Proceedings

in what financial accounts he has, and it doesn't address the separate concern that the defendant's family has access to tens of millions of dollars offshore.

And so if the defendant says I'm relinquishing access to my life insurance policy and resigning as a trustee on the trust policy, that still leaves tens of millions of dollars in his wife's life insurance policy and in the trust policy to which his brothers continue to be trustees.

So in short, those proposals still give him tens of millions of dollars to use in support of his flight provided his family is willing to facilitate it.

MR. GILBERT:  Judge?

THE COURT:  Go ahead.

MR. GILBERT:  His brother is going to be signing the bond.  He'll be on the hook for $50 million. His wife is signing the bond.  She'll be on the hook for $50 million.  I don't know what accounts overseas they're talking about.  And it's an insurance policy.  And we understand that there are insurance -- there are two other policies.  One is held by a trust.  He's going to resign.  He's going to turn over any rights he has in that.  And one is held by his wife.

So I don't think that there really are -- I think there's burden shifting going on here.  We can't

Transcriptions Plus II, Inc.

28

Proceedings

prove the negative.  He will submit an affidavit explaining what he has.  If the government has evidence that he has some other accounts, then they'll bring it to our attention.  But we're not aware of it.  We have no reason to believe that there are any, that there is anything else.

Oh, I stand corrected.  His brother would lose his home.  He's not proposed to be a cosigner.

THE COURT:  All right.  So let me ask you about the numbers.  I'm looking at paragraph B of your letter, the first page.  So you've indicated that there's value in the property, about 1.6 of the Connecticut property in terms of equity, and 1 million in the other property owned by the brother, and a combined value including the Manhattan property of 8.6 million.  Is that fair to say?  Is that right?

MR. GILBERT:  Well, the combined value to secure the bond we estimate is 8.6.  It consists of 6 million in cash and then the two properties.

THE COURT:  All right.  So if he were to flee, where would the other 43 million come from?

MR. GILBERT:  Well, the government would have a judgment for $50 million and they can take whatever steps are available to them to enforce that judgment against the assets of his wife who will be cosigning the bond,

29

Proceedings

and Mr. Rubin will be signing the bond, and his daughter who will be signing the bond. And Mr. Rubin's daughter will forfeit his home. I mean the financial consequences, it would be devastating, devastating financial consequences. The government makes light of it but I don't think there's any way to look at this proposal and suggest that there wouldn't be severe consequences to his wife, to his brother, to his daughter in the event that he flees.

THE COURT: I understand that but I notice in the government's papers that they're not sure whether this package is substantial to this defendant. All right? So I understand the wife and daughter have agreed to be cosigners on this bond, but at least as I read the government's letter, they don't know whether this package is actually substantial or not. I think to a layman it might be, but it might not be to this defendant. Right?

MR. GILBERT: Well, I think respectfully, it is substantial. I mean if he were to leave, he would be putting his brother in a situation where he would be forfeiting his only property, his home would be gone. His wife would lose a home that she owns in Connecticut and would be liable to the government for $50 million. And so I don't know how else to address the Court's concerns but I think in any fair reading of this it is

Transcriptions Plus II, Inc.

Proceedings

30

significant financial consequence on top of all of the other consequences that flow from someone choosing to live a life on the lam and has no country to go to, has no family anywhere else, no connections anywhere else, no property anywhere else. So I think it can't be -- I think the penalties would be immense.

THE COURT: Understood. Ms. McGrath, let me ask you do you have that information about the net worth of the daughter or the wife?

MS. MCGRATH: No, your Honor. So the defendant and his wife filed joint tax returns but they're not, because they don't earn income, they're not required to report income but they, you know, report investments. Our understanding is that the wife's life insurance policy is presently valued at approximately $56 million.

We'll also note that even though the brother is putting up his house, he would remain a trustee on the trust policy which we understand to be approximately $20.2 million.

We also want to correct two statements that defense counsel made but are happy to wait until -- if the Court has further questions.

THE COURT: Sure, no, go ahead.

MS. MCGRATH: It's quite misleading to describe these as life insurance policies. Of course they are,

Transcriptions Plus II, Inc.

31

Proceedings

but they're used as investment vehicles.  During the relevant period from 2014 up through 2025 the defendant has taken loans against the policies of approximately $63.5 million.  He's deposited those loans into his accounts that funded his sex trafficking enterprise.  And so these are very much used as slush funds for this family.

That it's described as a life insurance policy does not change the fact that it is used, you know, effectively as a bank account.

The suggestion that the investments are domestic is entirely irrelevant.  The government can't, you know, pierce the life insurance policy and go straight to those, to whatever those investments are wherever they are in the world.  Instead, like the defendant, we'd have to go to the Cayman Islands, the life insurance policy.  And it's not clear to us that that's necessarily available to us.

For those reasons, we submit not only is it not clear that the $50 million package may not be substantial as to this family, but there also doesn't seem to be a true likelihood of recovery.

And given the defendant's dangerousness in the government's view and his significant risk of flight including his many cell phones stashed away and the

Transcriptions Plus II, Inc.

32

Proceedings

presumption in this case, we don't think any package would be sufficient, but certainly this one is not.

THE COURT: All right. Mr. Gilbert, anything else?

MR. GILBERT: Yeah, just briefly, your Honor. I will refer the Court to the affidavit from the financial advisor which is Exhibit O. In paragraph 7 it says the investment manager instructs the financial institution at which the investment manager's brokerage account is held which is based in the United States to wire the requested funds to Crown Global.

So respectfully, we have submitted evidence that rebuts the government's assertion that these are offshore funds and that they wouldn't be able to enforce a $50 million bond. They would be able to. And that's what this affidavit shows. And as the government just said, with regard to Ms. Henry, that would reflect 98 percent of her holdings in that policy.

THE COURT: All right. I'm denying the package as presented to the Court at this time, I'm allowing defendant leave to renew in the future at the appropriate time, given the government's concerns about the substantialness of this package. They've raised concerns about the financial transparency of this defendant. Also given that the wife and the daughter have agreed to be

Transcriptions Plus II, Inc.

33

Proceedings

cosigners on this bond, perhaps the government may also want information about their financial wherewithal as well, right, because the government is concerned about the substantialness of this package. And as I said earlier, $50 million sounds like a lot of money to a layperson but it may not be for this defendant and his family. All right? And given those questions by the government, I'm not prepared at this time to approve this package as presented to the Court.

I'm also mindful that the government has submitted evidence in this package, or in its response to the package, that this defendant did in fact lead a double life and he has asked members of his family to come in as cosigners on this bond when in fact they may not have been aware of his activity in the past before the lawsuit, civil lawsuit, had been filed.

All right. So I'm not confident that at this point this package will, and the family members as cosigners on this bond, will hold moral suasion over this defendant and assure this Court that he will appear in court as directed and not be a danger to the community or involve himself in witness intimidations.

At this time I'm denying the package (indiscernible) if you address the concerns raised by the government as to the financial transparency of this

34

Proceedings

package.  Okay?

          MS. MCGRATH:  Thank you.

          THE COURT:  Thank you, your Honor.

          THE COURT:  All right.  Anything else for the defendant?

          MR. GILBERT:  No, your Honor.

          THE COURT:  All right.  Anything else for the government?

          MR. GILBERT:  No, your Honor.  Thank you.

          THE COURT:  Okay.  We are adjourned.  Thank you, everyone.

                    (Matter concluded)

                         -oOo-

35

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **20th** day of **October**, 2025.

*Mary Greco*

Transcriptions Plus II, Inc.